**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HENRY EARL DUNCAN,
            *Petitioner-Appellant,*

v.

STEVEN W. ORNOSKI,
            *Respondent-Appellee.*

No. 05-99010

D.C. No.
CV-92-01403-AHS

OPINION

Appeal from the United States District Court
for the Central District of California
Alicemarie H. Stotler, District Judge, Presiding

Argued October 26, 2007
Submitted March 6, 2008
Pasadena, California

Filed June 24, 2008

Before: Stephen Reinhardt, Ronald M. Gould, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Reinhardt

**COUNSEL**

Mitchell Zimmerman, Mountain View, California, Richard C. Neuhoff, New Britain, Connecticut, Kathryn J. Fritz and Albert Sieber, San Francisco, California, for the petitioner-appellant.

Edmund G. Brown, Jr., Attorney General of the State of California, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Senior Assistant Attorney General, Keith H. Borjon, Supervising Deputy Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Los Angeles, California, for the respondent-appellee.

## OPINION

REINHARDT, Circuit Judge:

Once again, we consider whether a capital defendant's appointed lawyer's performance was so deficient and prejudicial that it violated his Sixth Amendment right to counsel. Appellant Henry Earl Duncan was convicted of robbery and first-degree murder on March 3, 1986. The jury found the special circumstance allegation to be true and, after a brief penalty phase hearing, sentenced Duncan to death. The California Supreme Court affirmed the judgment on direct appeal and subsequently denied Duncan's petition for writ of habeas corpus on the merits. Duncan filed a federal habeas petition in the Central District of California. The district court denied most of his claims and then held a four-day evidentiary hearing, after which it rejected the rest. Duncan appeals.[1]

We conclude that Duncan's lawyer's performance was deficient during the guilt phase of his trial because he failed to investigate and present evidence that the blood samples from the crime scene that did not belong to the victim also did not belong to Duncan. This evidence would have tended to establish that Duncan had an accomplice who was in the murder room on the night of the murder, shed blood, and used the first aid kit on the wall to treat his wounds. Indeed, the evidence would have been sufficient to support an inference that

---

[1]We have jurisdiction under 28 U.S.C. §§ 1291 and 2253.

it was the accomplice, not Duncan, who killed the victim. Nevertheless, evidence with respect to Duncan's presence at the crime scene on the night of the murder, including his shoe prints, fingerprint, and palm prints in the money room, is sufficient to show that Duncan participated in the robbery and thus to sustain Duncan's conviction for felony murder. Accordingly, we hold that Duncan's lawyer's deficient performance did not prejudice him with respect to his conviction. However, counsel's failure to investigate and present the potentially exculpatory serological evidence did prejudice Duncan with respect to the jury's special circumstance finding, which, under California law at the time of his trial, required proof beyond a reasonable doubt that he intentionally killed the victim or, if not, that he intended that she be killed. Because the serological evidence raises doubts as to whether Duncan was the actual killer, and the evidence in the record does not establish beyond a reasonable doubt that Duncan intended that the victim be killed, we conclude that counsel's ineffective performance was prejudicial and thus constituted a Sixth Amendment violation. Accordingly, we reverse the judgment in part and remand with instructions to grant the petition as to the jury's special circumstance finding and to vacate the sentence.[2]

## I.  Factual and Procedural Background

### A.  The Crime

At the time of the murder, Duncan worked as a cashier at the International Host Restaurant in the Los Angeles Interna-

---

[2]Duncan also asserts that he received ineffective assistance of counsel in the penalty phase. Although his claim is likely meritorious, we need not reach the question because our holding necessitates vacating the sentence. We address Duncan's remaining claims that relate to the guilt phase of his trial in a separate memorandum disposition filed concurrently with this opinion. Because we find no merit to those claims, we affirm the district court's denial of habeas relief as to his conviction for first-degree felony murder.

tional Airport. The murder victim, Josephine Eileen DeBaun, was his supervisor. As part of her closing duties each night, DeBaun balanced the day's receipts and deposited them in a safe located in a small caged area in the restaurant's back office. This caged area was commonly called "the money room." DeBaun was murdered in the money room on the night of November 13, 1984.

On that evening, Duncan completed his regular shift and clocked out around 11:00 p.m. An airport custodian saw Duncan not far from the restaurant around 11:30 p.m., and Duncan told her that he was waiting for someone. DeBaun was last seen alive around 11:50 p.m. by another worker before he left the restaurant.

DeBaun's body was discovered on the floor of the money room the next morning. She had sustained multiple stab wounds and blood covered the tiny room. A broken knife handle was found on the floor next to her body. The supervisor's "floating fund bank"—a locked metal drawer used to store cash—was found open with $2100 missing and a ring of keys, including the VM-19 key used to open the bank, dangling from the lock. The ring of keys, commonly called the "boss key ring," was usually kept inside a padlocked key box that was mounted on the wall. Also kept in the box, but hidden, was an additional copy of the VM-19 key, which opened the floating fund bank. Police discovered the padlock to the key box underneath a bloodied Handiwipe rag that was sitting on a table near the body just below an open first aid kit that hung on the wall. The contents of the open first aid kit were disturbed, which suggested to police investigators that the assailant was injured during the attack and took some first aid supplies to treat his wounds. There were also a number of defensive wounds on the victim's hands and fingers, which indicated that there had been a struggle before the murder.

Police investigators found various bloody palm prints, a bloody shoe print, and a bloody fingerprint in the money

room. Duncan's fingerprints and palm prints, along with those of fifteen other individuals, were taken shortly after the crime. A fingerprint expert at the Los Angeles Police Department determined that Duncan's prints were not a match for the prints found at the crime scene. Police also took various blood samples from the crime scene and performed serological tests that showed that some of the blood did not belong to the victim.

A second robbery occurred at the restaurant three months later, in which $1770 was stolen from the supervisor's floating fund bank, which was opened with the duplicate VM-19 key. Three hundred dollars was also missing from Duncan's own cashier bank. Duncan was arrested for the second robbery. His prints were taken again and with that additional evidence, the bloody prints at DeBaun's murder scene were determined to be his.[3] The bloody shoe print was then found to be "similar in class characteristics" to a pair of shoes found in Duncan's house, and the duplicate VM-19 key was found in Duncan's car.

Duncan was charged with robbery and murder, and separately with grand theft. He subsequently pled guilty to the grand theft charge in connection with the second incident, and was tried on the robbery and murder counts in connection with the first. The Information alleged that Duncan personally killed DeBaun with a dangerous weapon and the special circumstance that he did so during the course of a robbery.

B.   The Trial

John Cheroske, who had originally been retained by Duncan's mother to represent Duncan at the preliminary hearing,

---

[3]According to the fingerprint expert, there was a mistake in the way the initial left index print had been taken the first time, and he was not able to make a match until Duncan's prints were taken a second time months later.

was appointed as defense counsel for Duncan's trial. Based on Cheroske's fee requests, Duncan's habeas counsel calculated that Cheroske spent no more than 35.1 hours preparing for Duncan's capital murder trial. *People v. Duncan*, 810 P.2d 131, 135 (Cal. 1991).[4] During the trial, evidence was introduced to show that Duncan was present at the crime scene, including his palm prints, fingerprint, and shoe print that were found at the scene. The jury also heard testimony from Gregory Matheson, a criminologist for the Serology Section of the Los Angeles Police Department, regarding blood found at that location. Matheson explained how he examined the blood lifted from the scene and compared his results with DeBaun's bloodtype, which was Type O, and genetic markers.[5] Three samples that he tested were inconsistent with DeBaun's blood —Items No. 5, 8, and 10.

Item No. 5 is a cloth square that was used to lift a blood stain from a partial shoe print left in blood on the money room floor. Matheson testified that Item No. 5 tested positive for A, B, and H antigens. When asked by the prosecutor whether it is possible for something other than blood to display that antigenic activity, Matheson explained that bacteria, animal

---

[4]This figure does not include time Cheroske spent during the preliminary hearing as retained counsel.

[5]The principal system used to categorize human blood is the A.B.O. system, which is made up of four blood types: Type O, Type A, Type B, and Type AB. Blood type is determined by testing for the presence of molecules called "antigens." All blood contains H antigens. People with Type A blood also possess A antigens. Those with Type B blood also possess B antigens. Those with Type AB blood also possess both A and B antigens. A person with Type O blood possesses only H antigens. A person's A.B.O. blood type is genetically determined and never changes throughout his life. The victim had Type O blood. Duncan also has Type O blood. Therefore, any antigens other than H that came from human bodily fluid necessarily came from someone other than Duncan or the victim. There are additional genetic markers that can be used to categorize blood. The presence or absence of certain enzymes determines a person's various blood subtypes.

blood, or other contaminants could have produced those results.

Item No. 8 is a blue and white Handiwipe rag with red stains that was removed from a table in the money room. The table was located below a first aid kit that hung on the wall. The first aid kit was found open and first aid supplies were missing, which led detectives to speculate that the killer was injured during the attack and used some of the first aid to treat himself. The rag was found lying on top of the padlock that was used to secure the key box where the key to the looted supervisor's bank was kept. Matheson testified that "there was A.B.O. activity that was present [on the rag] that was different from Miss DeBaun's but the bloodstain still could have come from her, but have been contaminated by some other source."

Item No. 10 is a cloth square used to remove a red stain from the floor.[6] Matheson testified that he detected A and B antigens, but no activity that was consistent with the victim's blood. Matheson concluded that this could mean that Type A and Type B blood or Type AB blood might be present.

Later in the trial, the State recalled Matheson to the stand and he testified that the stain on Item No. 10 was "mostly gray" instead of red or brown. This was inconsistent with the way he would "normally find a good bloodstain to be." In his supplemental testimony, Matheson also stated that Item No. 10 tested as a "weak positive" in the presumptive blood test and a "weak human positive" in the human species test. These

---

[6]There is some dispute as to where Item No. 10 was found. Detective Lewellen's Property Report describes the stain as located "on E side of door leading from store room to bar." The money room is east of the bar so if the property report is correct, the stain would have been lifted from just *inside* the money room. At trial, however, Detective Lewellen testified that the stain was lifted from the floor of the bar just *outside* the money room. There are no further clues in the record as to where the blood was actually found.

results caused him to doubt whether the stain actually contained human blood. Matheson further testified that Item No. 10 did not test positive for any of the different sub-types called genetic markers. According to Matheson, a number of things can cause this, including the fact that the sample was old, that the sample was not blood, or that it was a fresh sample that was too weak to produce a typing result. Matheson declined to draw any conclusions about the antigenic activity on Item No. 10. He stated: "All I know is that I got a weak indication of blood, and I did get antigenic activity. It could be from the blood."

In addition to the three samples described above, blood samples were taken from underneath the victim's fingernails. Matheson testified at trial that these blood samples were Type O blood and contained a subtype that was consistent with the victim's blood.

Matheson could not testify about whether the blood samples on any of the three items or from the fingernail scrapings could have belonged to Duncan because he was not given a sample of Duncan's blood. In fact, Duncan's blood type was unknown at the time of trial so it could not be determined whether the A and B antigens that were found at the crime scene belonged to him.

When Cheroske cross-examined Matheson, his lack of preparation was evident. At the outset, he said to Matheson: "[Y]ou lost me . . . when you've been talking about all of these numbers." Moreover, his line of questioning highlighted what turned out to be a damaging issue to the defense. Cheroske asked Matheson: "Now, taking Number 10 first, if you were given a whole blood sample from someone else, let's say this man over here, Mr. Henry Duncan, could you analyze it and tell if they are different types?" Matheson replied that he could have done so. Cheroske then asked Matheson twice whether he had compared the blood found at the scene with any other whole blood samples besides the vic-

tim's. Matheson replied that he had not been given any other blood samples besides the victim's. Cheroske's cross-examination only served to emphasize the fact that although Matheson could have determined whether Duncan's blood type was consistent—or inconsistent—with the blood found at the crime scene that did not belong to the victim, Duncan's blood was never given to the serologist to test. The prosecutor turned this fact to his advantage in his closing argument. Cheroske did not present expert witness testimony from a serologist or any other type of expert.

Cheroske's defense theory was that someone other than Duncan committed the murder. Detective Leroy Orozco testified at trial that, "because of the smallness of the area of the money room, that it's possible for two suspects, but I believe that only one could have attacked and killed Eileen." Cheroske argued that there was reasonable doubt as to whether this single killer was Duncan, but he did not support his theory with evidence that anyone other than Duncan was present or that anyone other than Duncan was the actual killer.

Cheroske presented circumstantial evidence that a number of suspicious individuals had been seen near the restaurant on the night of the murder. He attempted to show that the perpetrator must have been an "outsider," rather than an employee, by presenting evidence that the victim was tortured before her death, presumably in an attempt to get her to open a Brink's safe located inside the money room. He argued that the murderer must not have known, as an employee such as Duncan would have, that DeBaun could not open the safe without a second key that only the Brink's guard possessed. However, as Cheroske elicited on cross-examination from a restaurant employee, there was a sign on the front of the safe that read: "This can only be opened by Brink's."

During his closing argument, Cheroske argued that the prosecutor should have had Duncan's blood tested. The prose-

cutor responded in his closing argument that if the blood found at the scene had been inconsistent with Duncan's blood type, Cheroske would have presented that evidence:

> Mr. Cheroske said we should have gotten blood from the defendant and we should have compared it. . . . But, don't you think that the defense would have taken the blood of this defendant and brought it into court here with their own expert and had them testify to it if they thought there was the slightest chance to be able to prove that? . . . What would you do? Would you have the defendant's blood taken by your own person so that the prosecution could never find out about it, have it tested, find out what it is, and if it's different, you use it. If it's the same you never use it.

The prosecutor's argument implied that Cheroske actually did have the blood tested and the reason Duncan's blood type was never presented to the jury was that it was consistent with the blood found at the crime scene.

On March 3, 1986, following the conclusion of trial, the jury found Duncan guilty of first degree murder and robbery, found the special circumstance to be true and found that Duncan murdered DeBaun with a knife. The next morning, a brief penalty phase trial was held and the jury returned a death verdict the following day.

## C.   State Appeals and Federal Habeas Corpus Review

### i.   California State Court

On direct appeal, the California Supreme Court unanimously affirmed the verdict and the sentence. *People v. Duncan*, 810 P.2d 131 (Cal. 1991). However, in an unpublished order the court subsequently denied Duncan's petition and supplemental petition for habeas corpus by a four to three

vote. The three dissenting justices would have issued an order to show cause.

### ii. Federal Habeas Corpus

Duncan filed an original petition in the district court on March 4, 1993 and filed the operative Second Amended Petition on December 10, 1996. The petition included twenty-nine constitutional claims. Initially the district court ordered an evidentiary hearing on Claims 5, 8, 12, 13 and 17. The case was then stayed pending the resolution of *Lindh v. Murphy*, 521 U.S. 320 (1997), in which the Supreme Court held that the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") does not apply to cases that were pending at the time of its passage. *Id.* at 322-23.

Instead of proceeding with the evidentiary hearing as previously proposed, the parties agreed that Claims 5, 8, and 13 could be decided on the state court record. In an order filed on May 26, 1998, the district court denied Claim 8 (regarding trial counsel's misunderstanding of basic legal principles) and Claim 13 (regarding ineffective assistance of trial counsel for failure to object to certain statements made by the prosecutor during the closing argument of the penalty phase) based solely on the state court record.

The court subsequently denied Claim 5, based solely on the state court record, in an order filed on December 29, 1999. In Claim 5, Duncan alleges that Cheroske rendered ineffective assistance when he failed to consult a serologist and investigate the potentially exculpatory blood evidence found at the crime scene. Moreover, in that Claim, he asserts that the outcome of his case was prejudiced by Cheroske's failure to present serological evidence to the jury that suggested that an accomplice was present on the night of the murder.

In the state court post-conviction proceeding, counsel had arranged to have Duncan's blood tested and the tests had

revealed that Duncan has Type O blood, the same type as the victim's. This means that the antigenic activity that Matheson observed on Item Nos. 5, 8, and 10 that was inconsistent with the victim's blood could not have come from Duncan either.

Also in the state court post-conviction proceeding, Matheson, the State's serologist, submitted a declaration about the blood evidence and his trial testimony. He declared that if he had been questioned further at trial, he would have stated his conclusion that "the stain on Item No. 5 does represent human blood." Furthermore, Matheson stated in the declaration that in his professional estimation, it is "more likely than not that Item No. 5 represents one of the following: 1) a mixture of Type AB blood and Type O blood; 2) a mixture of Type A, Type B and Type O blood; 3) Type AB blood only; 4) a mixture of Type A and Type B blood; 5) any other combination of types providing the observed antigens; or 6) any combination of a blood sample mixed with other body fluids that exist in any of the combinations described in examples 1-5 above." The A and B antigens could not have come from Duncan or the victim because both individuals have Type O blood. Matheson also testified that although "anything is possible," contamination of blood samples with chemicals that create false positives "is not seen very often" and when it is, it usually happens on "clothing items, possibly due to the dyes or other chemicals present."

About the sample from Item No. 8, Matheson declared that "it is more likely than not that the stain on Item No. 8 is a mixture of human body fluids that include Type O blood and also body fluid(s) (such as blood, saliva or perspiration) from either a Type AB individual or Type A and Type B individuals." He further stated that it was "less likely" that a "non-human source" contaminated the sample. This is because he tested an unstained portion of the rag to verify that the antigens he detected were not coming from the rag itself. That control did not show any A.B.O. activity. According to Matheson, "[t]his represents a strong indication that the A and

B antigens on Item No. 8 are in fact from a human source." Again, the A and B antigens could not have come from either Duncan or the victim.

Finally, with regard to Item No. 10, Matheson declared that "though there is some doubt about the stain because of its color, in my expert opinion it is more likely than not that the stain on Item No. 10 does represent body fluid(s) from an individual or individuals with A and B antigens." Moreover, Edward Blake, a serology expert hired by Petitioner, explained in his declaration that A and B antigens often test strongly even when they are present in a small sample. If a small amount of blood was present on Item No. 10, it would make sense for the A and B antigens to test strongly even though there was only a weak indication of human blood and other genetic markers. Thus, the results of Matheson's testing of Item No. 10 are not unusual and are consistent with the conclusion that Item No. 10 contained human blood.

Moreover, Duncan's blood test revealed that although he has the same blood type as the victim, he has different genetic subtypes. Matheson testified at trial that the blood taken from underneath the victim's fingernails was of the same genetic subtypes as the victim's blood. Thus, the blood in those samples could not have belonged to Duncan. According to Matheson's Analyzed Evidence Report, many of the blood samples that he tested did not yield conclusive results for genetic subtypes. For all of the samples that did yield such results, the genetic subtype results matched those of the victim and not those of Duncan. Although the Type O blood from the crime scene with undetermined genetic subtypes *could* have belonged to Duncan, *none* of the Type O blood for which the genetic subtypes could be determined *did* belong to him.

Both Blake, Duncan's habeas serology expert, and Matheson summarized their conclusions about the blood evidence at the crime scene. According to Matheson:

All things considered, the most likely explanation of the evidence is that there was human body fluid at the crime scene that came from at least one (person who did not have Type O blood, and that that body fluid was deposited at the crime scene after the last time the floor was washed.

Blake's conclusion was as follows:

Based on the evidence, on the tests and controls performed by Mr. Matheson, and on my thirteen years as an expert serologist, I believe that there is only one reasonable and non-speculative interpretation of Mr. Matheson's results and of the other evidence: In my professional opinion, on the night of November 13, 1984, at some time after the restaurant was closed to the public, and after the routine floor washing was completed, someone with Type AB blood was injured, shed blood on the money room floor, and wiped off some of his or her blood on the blue and white Handiwipe rag. That person was neither the victim Josephine DeBaun nor the petitioner Henry Earl Duncan.

Both experts concluded that the blood samples found on the floor of the crime scene were, in all likelihood, deposited after the last time the floor was washed. Because the significance of the floor mopping was not known until after Duncan's blood was tested, neither party presented evidence on the question at trial. During the state court post-conviction proceedings, Peter Feimann, a bartender at the Host International Restaurant, declared that it was a regular and customary practice to mop the floors every night with soap and water. A manager, Shirley Goodell, stated that the floor mopping was not always thorough. Blake clarified, however, that even a "routine washing of the floor" would be "strongly likely to remove measurable antigens from the floor."

The State offered evidence that the night shift was short one utility worker on the night of the murder. However, Feimann stated that the person responsible for mopping the floors was working that night. Additionally, soon after the murder, the police interviewed two witnesses, Mark A. Christian and Arnell E. Jackson, who, separately and without prompting, claimed that they saw a custodian mopping the floor of the restaurant on the night of the murder. Cheroske had copies of the police reports in which Christian and Jackson were quoted, but he did not call either of them to testify at trial.

It is undisputed that Cheroske never had Duncan's blood tested to determine its genetic markers. In a sworn declaration, Cheroske stated that the reasons he did not test Duncan's blood were (1) Duncan admitted to him that he had been present in the money room and (2) he did not want to risk further tying Duncan to the scene.

After considering the record of the state proceeding that contained the aforementioned declarations and expert testimony regarding the floor washing and the blood found on Item Nos. 5, 8, and 10, the district court held that the evidence presented was not enough to establish ineffective assistance of counsel. The court found that when Cheroske decided not to test Duncan's blood, he reasonably relied on Duncan's statement that he was present during the murder. The court also found that Duncan was not prejudiced by Cheroske's omissions.

Next, the district court granted the State's motion for summary judgment on the remaining guilt phase and most of the penalty phase claims. It ordered an evidentiary hearing, however, on the portions of Claims 9 and 17 regarding ineffective assistance of counsel "based on trial counsel's failure to request funding for, or to consult with, a drug expert, or offer expert testimony on drug addiction at the penalty phase of petitioner's trial."

At the evidentiary hearing, the parties submitted deposition testimony, declarations, and other evidence, and the court heard some live testimony. Duncan presented evidence from several experts regarding the professional norms in 1985 and 1986 of investigating and presenting mitigating evidence at the penalty phase of a capital case. He also presented additional testimony from lay witnesses about his background, exposure to traumatic events in his childhood, and positive characteristics. A psychologist prepared and submitted a social history of Duncan. He and other experts testified about the psychological effects on Duncan of his childhood traumas and drug use, his personality disorders, his genetic predisposition to substance abuse, and indications that he suffered organic brain damage. The State presented the testimony of its own experts who challenged some of the conclusions of Duncan's experts.

The district court held that Cheroske's failure to consult an expert on drug use was deficient, but that his deficient performance did not prejudice Duncan. It then denied Duncan's Second Amended Petition for Writ of Habeas Corpus in its entirety in a judgment filed on September 30, 2005. Duncan now appeals.

## II. Standard of Review

[1] The claims that Duncan asserts on appeal were made in his federal habeas petition that was filed prior to the enactment of AEDPA, so the provisions of that Act do not apply to his claims. *See Lindh v. Murphy,* 521 U.S. at 322-23; *Douglas v. Woodford*, 316 F.3d 1079, 1085 (9th Cir. 2003). This court reviews the district court's decision to deny habeas relief *de novo*. *Lambright v. Schriro*, 490 F.3d 1103, 1113-14 (9th Cir. 2007). Ineffective assistance of counsel claims are a mixed question of law and fact and we review them *de novo*. *Summerlin v. Schriro*, 427 F.3d 623, 628 (9th Cir. 2005) (en banc). We review for clear error the district court's findings of fact. *Frierson v. Woodford,* 463 F.3d 982, 988 (9th Cir.

2006). Finally, because this case is not subject to the provisions of AEDPA, "we do not review the state court's legal conclusions to determine whether they are 'objectively unreasonable;' rather, we 'simply resolve the legal issue on the merits, under the ordinary rules.' " *Summerlin*, 427 F.3d at 628-29 (quoting *Belmontes v. Brown*, 414 F.3d 1094, 1101 (9th Cir. 2005), *rev'd on other grounds*, *Ayers v. Belmontes*, 549 U.S. 7 (2006)).

## III.   **Discussion**

In order to convict Duncan of first degree felony murder, the State had to prove only that he intended to commit the robbery and that the murder occurred in the course of the robbery. Because there was compelling evidence, including the palm prints, fingerprint, and shoe print, that Duncan was present and participated in the robbery, and because the murder was clearly related to the robbery, we reject Duncan's claim that his conviction should be reversed on the ground of ineffective assistance of counsel. Counsel's failure to obtain a serology expert and to have blood tests performed was harmless with respect to the conviction. In order to prove the special circumstance allegation that would trigger the penalty phase, however, the State was required to show that Duncan himself intentionally killed DeBaun or that he intended that she be killed by an accomplice. Here, the serological evidence that Cheroske failed to develop during trial would have raised substantial doubt as to whether Duncan actually killed DeBaun. Moreover, if he was not the killer, the evidence in the record would not have established beyond a reasonable doubt that he intended that DeBaun be killed. Thus, the special circumstance allegation is the focus of our analysis.

There was significant evidence that an individual other than the victim was wounded and shed blood in the money room on the night of the crime. Because there was evidence of a struggle during the course of the attack, and the injury probably resulted from this struggle, the killer was likely the donor

of the blood that did not belong to the victim. Moreover, the State advanced the theory, supported by the testimony of a police detective, that the money room was too small to accommodate more than one killer. Thus, if Cheroske could show that some of the blood in the money room was neither DeBaun's nor Duncan's, considerable doubt would be raised that Duncan was the killer; if he were not, there is little, if any, evidence that would tend to show that he intended that DeBaun be killed. Accordingly, Cheroske's failure to investigate and present the serological evidence prejudiced Duncan with respect to the jury's special circumstance finding.

### A. Ineffective Assistance of Counsel

[2] A defendant's Sixth Amendment right to representation in a criminal trial includes "the right to the effective assistance of counsel." *McMann v. Richardson,* 397 U.S. 759, 771 n.14 (1970). To prevail on a claim of ineffective assistance, a petitioner must show that: (1) his trial counsel's performance "fell below an objective standard of reasonableness"; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

Because Cheroske's failure to consult an expert in serology that would have enabled him to make informed, strategic decisions with regard to the blood evidence, his failure to have Duncan's blood tested, and his failure to present the results of those tests at trial were constitutionally deficient, and because his deficient performance casts substantial doubt on the jury's special circumstance finding, we reverse the district court's denial of the writ of habeas corpus.

### i. Deficient Performance

Under *Strickland*, we must presume that counsel was competent and Duncan must rebut this presumption by showing

that his performance was objectively unreasonable under prevailing professional norms and was not the product of sound strategy. *Id.* 688-89. "Judicial scrutiny of counsel's performance must be highly deferential," and we must evaluate counsel's conduct from his perspective at the time, without the benefit of hindsight. *Id.* at 689. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690. However, decisions that are made before a complete investigation is conducted are reasonable only if the level of investigation was also reasonable. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness [under] all the circumstances . . . ." *Id.* at 691; *see also Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003).

**[3]** The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.' " *Wiggins,* 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688). However, we have established general principles that guide our determination of what constitutes objectively reasonable attorney performance, including the duty to investigate. *See Summerlin*, 427 F.3d at 629-30.

**[4]** This court has repeatedly held that "[a] lawyer who fails adequately to investigate and introduce . . . [evidence] that demonstrate[s] his client's factual innocence, or that raise[s] sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance." *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999) (holding that counsel's failure to review key documents corroborating defense witness's testimony constituted deficient performance); *see also Avila v. Galaza*, 297 F.3d 911, 919 (9th Cir. 2002) (holding that counsel's failure to investigate evidence that defendant's

brother was the shooter constituted deficient performance); *Lord v. Wood*, 184 F.3d 1083, 1095-96 (9th Cir. 1999) (holding that counsel's failure to call key witnesses whose testimony undermined the prosecutor's case constituted deficient performance); *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994) (holding that counsel's failure to investigate evidence that someone else was the killer constituted deficient performance). "The failure to investigate is especially egregious when a defense attorney fails to consider potentially exculpatory evidence." *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002); *see also Harris v. Wood*, 64 F.3d 1432, 1435-37 (9th Cir. 1995) (holding that counsel's failure to retain an investigator and interview many of the individuals identified in the police reports was deficient performance).

We allow lawyers considerable discretion to make strategic decisions about what to investigate, but only *after* those lawyers "*have gathered sufficient evidence upon which to base their tactical choices.*" *Jennings v. Woodford*, 290 F.3d 1006, 1014 (9th Cir. 2002). When defense counsel merely believes certain testimony *might* not be helpful, no reasonable basis exists for deciding not to investigate. *See Avila*, 297 F.3d at 920 (holding that the lawyer's belief that certain testimony might not be helpful at trial was an unreasonable basis upon which to decide not to investigate and thus constituted deficient performance).

[5] Although it may not be necessary in every instance to consult with or present the testimony of an expert, when the prosecutor's expert witness testifies about pivotal evidence or directly contradicts the defense theory, defense counsel's failure to present expert testimony on that matter may constitute deficient performance. *See Caro v. Woodford*, 280 F.3d 1247, 1254-56 (9th Cir. 2002) (holding that counsel was deficient for failing to consult an expert and present expert testimony about the physiological effect of toxic chemical exposure on defendant's brain); *Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001) (finding deficient performance when counsel

failed to hire an expert to rebut the prosecution's expert testimony about physical evidence linking defendant to the crime scene when the defense theory was that defendant was not at the crime scene), *remand order modified by stipulation*, 268 F.3d 485 (7th Cir. 2001) (vacated at request of parties when settlement was reached); *Troedel v. Wainwright*, 667 F. Supp. 1456, 1461 (S.D. Fla. 1986) (holding that counsel's failure to depose the State's expert, and more important, failure to consult with an expert in order to contradict key evidence of the "most crucial aspect of the trial" was deficient), *aff'd Troedel v. Dugger*, 828 F.2d 670 (11th Cir. 1987) (per curiam).

[6] Here, Cheroske's defense was that Duncan did not kill DeBaun, yet he did not advance any plausible alternative theory or present any specific evidence that he was not the murderer. There was, however, specific evidence that was before the jury that could have shown that Duncan did not kill DeBaun—the blood samples. Despite the fact that Cheroske had a copy of the police serology report and that his highlighting and underlining of that report suggest that he understood the significance of the blood samples that contained antigenic activity that was inconsistent with the victim's blood, Cheroske did not consult a serology expert or have Duncan's blood tested. Cheroske's failure to consult a serologist when there existed potentially exonerating blood evidence, and his subsequent failure to have Duncan's blood tested and present the results of those tests at trial were unreasonable under prevailing professional norms.

[7] Cheroske did not consult a serologist or conduct any investigation whatsoever with regard to the blood evidence. It is especially important for counsel to seek the advice of an expert when he has no knowledge or expertise about the field. *See Dugas v. Coplan*, 428 F.3d 317, 331 (1st Cir. 2005). Cheroske demonstrated his lack of expertise in serology at the outset of his cross-examination of the State's serology expert when he told him, "You lost me." Moreover, it appears that Cheroske did not even know what serology was. Serology is

the study of *blood serum*, yet when Cheroske cross-examined Matheson, a serology expert, he asked him about *hair* evidence. Clearly, Cheroske did not have the personal expertise in serology to make strategic decisions about how to handle the blood evidence on his own and he certainly was not qualified to undermine the State's case by simply cross-examining its experts without obtaining expert assistance himself.

[8] Additionally, the central role that the potentially exculpatory blood evidence could have played in Duncan's defense increased Cheroske's duty to seek the assistance of an expert. The samples of blood that did not belong to the victim were the only forensic evidence that had not been linked to Duncan and that could have established that someone other than he was the murderer. Whereas the State's experts testified that the fingerprint, palm prints, and shoe prints that were found at the scene likely belonged to Duncan, there was no expert who could link Duncan to the blood. Cheroske should have consulted a serology expert as soon as he read the evidence report and noticed that there was blood found at the crime scene that did not belong to the victim so that he could fully understand the forensic implications of that evidence and make an informed decision about how to proceed at trial. *See Driscoll v. Delo*, 71 F.3d 701, 709 (8th Cir. 1995) ("[A] reasonable defense lawyer would take some measures to understand the laboratory tests performed and the inferences that one could logically draw from the results.").Cheroske provided no explanation for why he failed to consult a serology expert or investigate the potentially exculpatory blood evidence. He certainly did not advance a strategic or tactical reason for failing to do so. The record, however, reveals one possible explanation that appears in his argument in opposition to a motion that the State filed during trial to compel a blood test to determine Duncan's blood type. Cheroske stated that in reading the evidence reports, it was "clear to me that the typings were different and it was not my burden to do anything with regard to that other than in all fairness to rely on the state of the evidence as it was produced." Apparently,

Cheroske did not believe that when he became aware of the blood evidence, he had any duty to consult an expert who could assist him in preparing his cross-examination and serve as an expert witness on Duncan's behalf, or make any effort to establish that the blood that came from someone other than the victim did not belong to Duncan. Cheroske's inaction was unreasonable, especially given that the blood samples were the only potentially exculpatory evidence in the case.

**[9]** Had Cheroske consulted a serologist, he would have been prepared to make the necessary decisions regarding the testing of Duncan's blood, what further investigation should be done, and how to approach his cross-examination of the State's serology expert. Without consulting an expert, Cheroske had no basis upon which to devise his defense strategy. His failure to investigate the blood evidence, despite the fact that he knew that it existed and that he understood the possible implications of it, constituted deficient performance.

Cheroske's failure to have Duncan's blood tested in order to determine whether the blood that was found at the crime scene that did not belong to the victim was his also constituted deficient performance. Having Duncan's blood tested posed no risk to Duncan's defense, but the potential benefit was enormous. The blood evidence, detailed in the police report that Cheroske highlighted and underlined, was the only forensic evidence that had not yet been tied to Duncan. Thus, it presented Cheroske with his only opportunity to cast doubt on the State's theory that Duncan was the actual killer.

The district court held that Cheroske's failure to have Duncan's blood tested was not deficient because it was based on a reasonable tactical decision that is entitled to deference. The court found that Cheroske decided not to have Duncan's blood tested because Duncan admitted to him that he had been present in the murder room and Cheroske did not want to further connect Duncan to the crime scene.[7] The district court clearly erred in its holding.

---

[7]The district court went on to speculate that counsel could have reasonably decided that investigating the blood evidence would be fruitless given

**[10]** Cheroske's first explanation for failing to have Duncan's blood tested was that Duncan told him that he was "present in the murder room." However Duncan had also told his counsel that "he was neither the killer nor did he aid in the killing." The only scenario in which those two statements could be true is one involving an accomplice who was the actual killer. Blood at the crime scene that belonged to neither Duncan nor to the victim would have been evidence not only that there was someone else involved in the attack, but also that the other perpetrator was likely the actual killer, not the bystander who was merely "present," given that the actual killer would have been the one injured in a struggle. When "tantalizing indications in the record" exist, such as the potentially exculpatory blood evidence in this case, a reasonable

the rest of the evidence tying Duncan to the crime. The State further contends that Cheroske told a prosecutor that he did not test Duncan's blood because Duncan refused to take a blood test and Duncan revealed to Cheroske that he had received cuts during the crime so that any blood at the crime scene would have been his. The district court noted the State's argument and acknowledged that those reasons would also support counsel's decision not to investigate the blood evidence, but the court did not find that these were Cheroske's actual reasons, nor did it find that Cheroske actually made the statements that the State alleged. In light of the Supreme Court's admonitions that reviewing courts may not substitute their own strategic reasoning for that of trial counsel in order to find that counsel's performance was justified, we do not consider these additional speculative justifications to be Cheroske's *actual* reasons for declining to test Duncan's blood. *See Wiggins*, 539 U.S. at 526-27 ("[T]he 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing."); *see also Alcala v. Woodford*, 334 F.3d 862, 871 (9th Cir. 2003) ("We will not assume facts not in the record in order to manufacture a reasonable strategic decision for Alcala's trial counsel."); *United States v. Burrows*, 872 F.2d 915, 918 (9th Cir. 1989) (per curiam) (holding trial counsel deficient for failing to investigate an insanity defense partly because "the district court's assumptions that the attorney must have considered an insanity defense and might have rejected it for strategic reasons appear not to have been based on the record").

attorney would investigate further. *Stankewitz v. Woodford*, 365 F.3d 706, 720 (9th Cir. 2004).

**[11]** Cheroske's second stated reason for not having Duncan's blood tested was that given the fingerprint evidence, he did not want to risk further tying Duncan to the crime scene. This explanation is unpersuasive. It reveals Cheroske's ignorance about forensic evidence and further demonstrates why he should have consulted an expert before making critical tactical decisions. As the State's fingerprint expert, George Herrera, testified, "nobody in the world has the same fingerprints," therefore, fingerprints and palm prints can be ascribed to a specific individual with certainty. Given that one of Duncan's fingerprints and three of his palm prints were found at the crime scene, he was clearly present. If Cheroske had consulted a serology expert, he would have learned that blood evidence cannot be tied to a specific individual. Blood evidence can only be used to rule out a certain percentage of the population as potential donors of a particular sample. Thus, there was little risk of further tying Duncan to the crime through the blood evidence. Cheroske did not have the requisite knowledge or information to make any decisions about the blood evidence without consulting an expert, so his failure to have Duncan's blood tested is not entitled to deference. *See Avila*, 297 F.3d at 920 ("[C]ounsel can hardly be said to have made a strategic choice when s/he [sic] has not yet obtained the facts on which a decision could be made.") (quoting *Sanders*, 21 F.3d at 1457 (internal quotation marks omitted) (quoting *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989)).

Moreover, there would have been no harm in getting Duncan's blood tested, even if the tests had revealed that his blood was consistent with the blood in items 5, 8, and 10, which they did not, because Cheroske could have determined Duncan's blood type without having to reveal the result. At the time of trial, California law permitted confidential testing by defense experts. Cal. Penal Code § 987.9 (West 1986). Even the prosecutor advised the jury in his closing argument that

Cheroske could have had Duncan's blood tested in secret. In fact, the prosecutor took full advantage of the fact that Duncan's blood type was never presented at trial and suggested to the jury that the omission proved that the blood evidence was inculpatory. He told the jury that Cheroske likely would have tested Duncan's blood in secret but would have revealed the results only if they were favorable to him. He then argued to the jury that the reason that there was no evidence presented at trial about Duncan's blood type was that the evidence was consistent with the theory that Duncan was the killer.

Moreover, even if Cheroske feared that California's procedures for getting a sealed court order to test Duncan's blood would not have protected the confidentiality of the results, he could have determined Duncan's blood type surreptitiously without a court order. If Cheroske had consulted a serology expert, he would have known that most of the population's blood type can be detected in bodily fluid other than blood. Duncan is one such person, a so-called "secretor," so Cheroske could have obtained a small sample of his saliva in a vial or cloth and used that to determine his blood type without notifying the court or the State. Cheroske had nothing to *lose* by testing Duncan's blood, but he stood to *gain* crucial evidence by doing so.

The State contends that Cheroske did not test Duncan's blood because Duncan admitted to him that he had committed the murder. The district court did not find this to be Cheroske's reason, nor does the record support such a claim. Even if this were Cheroske's actual reason, however, it would be unreasonable. A defendant's admission of guilt to his lawyer does not absolve the lawyer of his duty to investigate the crime. The professional norms in existence at the time of Duncan's trial and recognized by the Supreme Court clearly state that counsel must "explore all avenues leading to facts relevant to the merits of the case . . . . The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt . . . ." *Rompilla v. Beard*,

545 U.S. 374, 387 (2005) (quoting 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.) (internal quotation marks omitted)).

Strategic decisions based on information provided by the defendant are often reasonable and entitled to deference. *See, e.g.*, *Strickland*, 466 U.S. at 691 ("Counsel's actions are usually based, quite properly, . . . on information supplied by the defendant."). However, counsel must consider all of the defendant's statements, not just those that make his job easier. Even if we were to give credence to the State's dubious allegation that Duncan confessed to Cheroske, which we do not, the glaring inconsistencies in Duncan's reported accounts of the murder made it unreasonable for Cheroske to rely on any one of Duncan's statements in isolation when making tactical decisions about investigating the crime. Moreover, the fact that having Duncan's blood tested could not possibly have *harmed* the case, even if the results were inculpatory, because the test results could have remained confidential makes Cheroske's failure to do so even more unreasonable.

The State also contends that Duncan refused to have his blood tested. The district court did not find this to be Cheroske's reason for not having the test performed and Cheroske does not cite this as his reason in his sworn declaration. Even assuming that it were true, however, Cheroske could have attempted to discover Duncan's blood type in other ways. For example, he could have examined Duncan's medical records to see if they contained his blood type. Cheroske never obtained those records. As we have previously held, "if a client forecloses certain avenues of investigation, it arguably becomes even more incumbent upon trial counsel to seek out and find alternative sources of information and evidence, especially in the context of a capital murder trial." *Silva v. Woodford*, 279 F.3d 825, 847 (9th Cir. 2002). Moreover, had Cheroske consulted an expert, he could have explained to Duncan that his blood type probably could be

determined from his saliva without the prosecutor discovering the results, and Duncan might have cooperated.

**[12]** None of the reasons given by Cheroske in his own declarations or attributed to Cheroske by the State are consistent with a sound defense strategy entitled to the deference of this court. All of his stated reasons amount to a fear that the blood samples found at the scene would be consistent with Duncan's blood. This fear was unwarranted for two reasons. First, blood cannot be directly tied to its donor through blood typing, which Cheroske would have known had he consulted a serology expert. Thus, even if the blood samples were consistent with Duncan's blood type, there would have been no way to prove that they came from him, unlike the fingerprint and palm prints that were lifted from the crime scene and conclusively proved that Duncan was present. Second, Cheroske could have tested Duncan's blood without the knowledge of the prosecutor and, once he knew the results, he could have made a strategic decision about how to deal with the blood evidence at trial. Cheroske's failure to consult a serology expert and determine Duncan's blood type when he was on notice of the existence of potentially exculpatory blood evidence was unreasonable under prevailing professional norms and constitutes deficient performance under *Strickland*.

## ii. Prejudice

**[13]** To establish that Cheroske's deficient performance prejudiced him, Duncan must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. It is not necessary, however, to show that counsel's deficient conduct "more likely than not altered the outcome in the case." *Sanders*, 21 F.3d at 1461. In determining whether a defendant was prejudiced by counsel's inadequate representation, we examine the evidence that could have been presented to the jury

had counsel performed competently and compare that to the evidence that the jury actually heard. *See Bonin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995). If the difference between the evidence that could have been presented and that which actually was presented is sufficient to "undermine confidence in the outcome" of the proceeding, the prejudice prong is satisfied. *Strickland*, 466 U.S. at 694.

Before considering the question of prejudice, we will reiterate the California procedure in death penalty cases, so as to make it easier to understand to which portion of the proceedings Cheroske's deficient performance was prejudicial and to which it was not. Under California law, there are three basic decisions that a jury must make before the court may sentence to death a defendant who is charged with first degree murder with special circumstance. After the guilt phase of the trial is complete, the jury must decide whether to convict the defendant of first degree murder. Cal. Penal Code § 189 (West 1986). If it finds the defendant guilty of first degree murder, it must next decide whether one or more of the alleged "special circumstances" is true beyond a reasonable doubt. Cal. Penal Code §§ 190.2, 190.4 (West 1986). If the jury finds the defendant guilty of first degree murder and finds that one or more of the special circumstances are true, then a penalty phase trial is conducted, at the conclusion of which the jury makes its final decision—whether to recommend that the defendant be sentenced to life in prison without the possibility of parole or to death.

As we have stated earlier, even with the benefit of the additional blood evidence that Cheroske failed to present, we would be required to affirm Duncan's conviction for first degree murder. There was sufficient evidence, in the form of a fingerprint, shoe prints, and palm prints, to place him at the scene of the crime on the night of the murder and to prove that he intended to rob the restaurant. Because the murder was committed in furtherance of the robbery, Duncan would be guilty of first degree murder under California's felony murder

rule even if he did not actually murder DeBaun or intend that she be killed. *See People v. Pulido*, 936 P.2d 1235, 1239 (Cal. 1997).

[14] The blood evidence becomes relevant, however, when we consider the jury's special circumstance finding. The State alleged the special circumstance of robbery-murder, which, at the time of trial, required a finding that the defendant intended that the victim be killed, whether he was the actual killer or an accomplice. *See Carlos v. Superior Court*, 35 Cal. 3d 131, 153-54 (1983), *partially overruled by People v. Anderson*, 43 Cal. 3d 1104 (1987) (holding that proving intent to kill is not required when the defendant is the actual killer, but it is required when the defendant is an accomplice). Consequently, unlike the first degree murder conviction for which the jury was required to find only that Duncan intended to rob the restaurant and that DeBaun was somehow killed in the course of the robbery, the special circumstance rule required the jury to find that Duncan intentionally killed DeBaun himself or, if she was killed by an accomplice, that Duncan intended that she be killed.

Once Duncan's presence at the crime scene was established through the forensic evidence, the one-killer theory advanced at trial and uncontradicted by defense counsel, coupled with the brutal nature of the attack, compelled the finding that he intentionally killed DeBaun. However, if Cheroske had presented the alternative theory that Duncan had an accomplice, he could have raised a question in the minds of the jury as to whether Duncan was the actual killer and whether he intended that DeBaun be killed. As the district court acknowledged, "[i]ntent to kill would have been harder to prove if petitioner was not the actual killer." If at least one juror had a reasonable doubt that Duncan killed DeBaun or that he intended his accomplice to kill her, the jury could not have returned a verdict against Duncan on the special circumstance allegation.

[15] Had Cheroske consulted a serologist, investigated the blood evidence, and properly cross-examined the State's wit-

nesses, the jury would have heard convincing evidence about the existence of blood at the crime scene that did not belong to either DeBaun or Duncan. The jury would have heard how that evidence points to the existence of an accomplice who accompanied Duncan to the restaurant that night and who was injured during the ensuing struggle with DeBaun. The jury would also have heard that none of the blood found in the money room belonged to Duncan. Together with the detective's testimony that the small room in which the actual killing took place could likely accommodate only one killer, the serology evidence that Cheroske should have presented would strongly support the theory that the accomplice was the actual and only killer.

If Cheroske had investigated the blood evidence, he could have presented the expert testimony of a serologist who would have testified that Duncan, like the victim, has Type O blood. That expert could have explained to the jury that although a great deal of Type O blood was found at the crime scene, none of it contained detectable subtypes that were consistent with the subtypes in Duncan's blood.

Moreover, if Cheroske had investigated the blood evidence, he would have been prepared to effectively cross-examine Matheson, the State's serology expert. At trial, Matheson testified that contaminants could have produced the test results in Items No. 5, 8, and 10, which made it easy for the jury to dismiss the questions raised by those samples. If on cross examination Cheroske had been informed about serology, however, he could have asked Matheson how likely it was that the samples were contaminated. Matheson would have been forced to respond, as he did in his post-trial declaration, that the possibility of contamination by other sources was "not seen very often" and was of "the lowest possibility."

Also, if Cheroske had been prepared to cross-examine Matheson, he could have elicited the testimony about Items No. 5, 8, and 10 that Matheson gave in his post-trial declara-

tion. If questioned further, Matheson would have testified that the stain on Item No. 5 was blood and that it likely contained blood that was not the same type as Duncan's blood or the victim's blood. Cheroske could have emphasized through cross-examination that Item No. 5 was taken from a sample of blood that was large enough to make a partial shoeprint. Thus, it was unlikely that it could have been deposited earlier in the day, before the crime, and escaped the notice of the employees and the cleaning crew.

With respect to Item No. 8, the stained Handiwipe rag, Matheson would have testified if questioned further that Item No. 8 likely contained a mixture of body fluids from someone with Type O blood and someone with Type AB blood or one person with Type A and one person with Type B.[8] Moreover, Matheson would have testified that the antigenic activity that he detected in Item No. 8 came from a human source rather than contamination because he tested the unstained portion of the rag and detected no antigenic activity.

As to Item No. 10, the stain lifted from the floor near the door between the money room and the bar area, Matheson would have testified that although the color of the stain was unusual, it likely came from the body fluid of someone with Type AB blood. As to that item, Cheroske could also have introduced into evidence Detective Lewellen's property report, which he prepared the day after the stain was lifted, and in which he described the stain as "red."

If Cheroske had cross-examined Matheson effectively, the jury would have heard Matheson's final conclusion that the most likely explanation of the blood evidence "is that there

---

[8]The latter scenario is unlikely as it would involve three people shedding blood and staining the Handiwipe rag on the night of the murder, two of whom could not be Duncan or the victim. There is no suggestion by any participant in the proceeding that Duncan had two accomplices, nor is there any other evidence to support such a theory.

was human body fluid at the crime scene that came from at least one person who did not have Type O blood, and that the body fluid was deposited at the crime scene after the last time the floor was washed."

In addition to effectively cross-examining Matheson, Cheroske should have had his own serology expert testify at trial. Such an expert would have given testimony similar to that of Blake, the serology expert hired by post-conviction counsel. Like Blake, he could have testified that the "only reasonable and non-speculative interpretation" of the blood evidence and Matheson's test results was that on the night of the murder, "someone with Type AB blood was injured, shed blood on the money room floor, and wiped off some . . . on the blue and white Handiwipe rag." That person could not have been the victim or Duncan, because both of them have Type O blood.

Furthermore, a defense serology expert could have clarified that the possibility that the antigenic activity detected in Items No. 5, 8, and 10 could have come from non-blood body fluid was infinitesimally small. According to Blake:

> [T]he AB antigens were on three separate items which have blood on them. It would be an extraordinary and highly unlikely set of coincidences for all three items to happen to have saliva or perspiration or another bodily fluid on them. Second, the non-stained part of Item No. 8, the Handiwipe rag, was tested and showed no antigenic activity. This means that if blood were *not* the source of the "A" and "B" antigens on Item No. 8, then the further coincidence is required that the other body fluid was deposited *only* on the part of the Handiwipe rag that had a blood stain on it. Third, as to the red stains from the money room floor (Item No. 5 and Item No. 10), again the coincidence would be required that the non-blood bodily fluid should have been located in

two separate places where there was blood on the floor, but not on the part of the floor from which the control Item No. 4[9] was taken. . . . Although it may be possible to concoct a scenario that theoretically could account for non-blood fluids on all three items, such a scenario would be complex, speculative, implausible and improbable.

If Cheroske had consulted a serology expert and arranged for Duncan's blood to be tested, Cheroske would have understood the importance of establishing that the floor had been mopped the night of the murder. He could have called Mark Christian and Arnell Jackson, two witnesses who independently told police that they observed a custodian mopping the floor the night of the murder, to testify. Additionally, Feimann, the bartender would have testified that the floors were mopped every night with soap and water and that the person responsible for mopping the floors was working the night of the murder. This testimony would have been more than sufficient to convince the jury that the floor had been washed before the murder occurred so that any blood that was found at the crime scene must have been shed during the attack.

Certainly the testimony that Cheroske could and should have elicited from Christian, Jackson, and Feimann would have been enough to dispel any doubt that might have been raised by Goodell, the State's witness. In her post-trial declaration, Goodell claimed that the night shift was short one utility worker the night of the murder. She also stated that the mopping was not always thorough. However, Cheroske's serology expert could have explained that a thorough mopping was not necessary and that a routine mopping was sufficient to remove antigens from the floor.

---

[9]Item No. 4 was a cloth that was used to lift a bloody shoe print from the money room floor. The shoe print was located approximately four feet from the shoe print that was used in Item 5. The sample tested positive for Type O blood and negative for A and B antigenic activity.

Even if the floor was not mopped, or was not mopped thoroughly, it is difficult to believe that the blood sample from which Item No. 5 was made would have been overlooked during the day. Item No. 5 was taken from a bloody shoe print. It is unlikely that a bloody shoe print (or a sufficient amount of blood to create a shoe print), would have escaped notice during the day and remained on the money room floor. It is equally unlikely where there are two bloody shoe prints on the floor in a small room that one came from blood spilled during the course of a murder and the other from blood that happened to be on the floor for several hours prior to the killing but went unnoticed by those in the room earlier. Moreover, it is unlikely that an injury that produced enough blood to create a shoe print would have occurred in the money room. Presumably, any such earlier injury would have occurred in the kitchen where there were knives. The only plausible explanation for the blood sample is that DeBaun wounded her attacker and he shed blood on the money room floor.

The district court found that Duncan did not "present conclusive evidence that the floor of the restaurant was mopped on the night of the murder" or establish that "the cleaning was thorough enough to remove blood or other bodily fluids from the floor of the money room." The burden of proof that the district court imposed—proof by conclusive evidence—is not the correct standard. Under *Strickland*, Duncan has to prove only that the omitted evidence is sufficient to undermine confidence in the outcome. 466 U.S. at 693-94. Given that the floors were customarily washed every night, that there were two witnesses who saw the floors being washed on the night of the murder, and that the employee responsible for washing the floors was working that night, it is reasonable to conclude that at least one juror would have believed that the floors were mopped after the restaurant closed and before the murder took place.

The question whether the floor was washed is relevant to Items No. 5 and 10, but not Item No. 8, the blood sample

taken from the bloody Handiwipe rag, because that sample was not lifted from the floor. The circumstances under which the rag was found strongly suggest that the bloody rag was used after the murder by the assailant who was injured in the attack. First, the rag was found lying below an open first aid kit that hung on the wall. The kit was missing supplies, leading police to speculate that the injured attacker used the rag to absorb some of his blood and then used the supplies to treat his wounds. Second, the rag was found lying on top of the padlock to the key box. As the State explained in closing argument, the assailant would have had to unlock and remove the padlock from the key box in order to obtain the key that opened the floating fund bank. Because the key box was always kept closed and locked, the padlock must have been removed by the perpetrators of the robbery. Moreover, because the rag was found on top of the padlock, it is extremely unlikely that the blood on the rag belonged to a restaurant employee who was injured during the day and left the bloody rag in the money room, as suggested by the State. Under that scenario the attacker would have had to slip the padlock underneath the bloody rag. The far more likely scenario is the one proposed by the detectives—that DeBaun's attacker was wounded in the struggle, used the rag and the first aid supplies from the kit to treat his wounds, and left the rag lying on top of the padlock that he had previously removed from the key box in order to open the safe. Clearly, the actual killer would be the one who was injured during the struggle so the fact that the blood found on that rag did not belong to Duncan raises doubt that he killed DeBaun.

If Cheroske had investigated the blood evidence, tested Duncan's blood, and presented the accomplice theory to the jury, it is likely that at least one juror would have had a reasonable doubt that Duncan was the one who killed DeBaun.

At trial, Cheroske tried to establish that other individuals may have had a motive to kill DeBaun, but he never presented any physical evidence tying anyone else to the crime scene.

In fact, all of the physical evidence that was presented at trial tied Duncan to the crime scene. Additionally, there was no evidence or argument presented at trial that Duncan had an accomplice. Thus, given the strong physical evidence tying Duncan to the scene and the lack of any other explanation for the murder, it is not surprising that the jury believed that Duncan was the actual killer and that he killed DeBaun intentionally. The serological evidence introduced during the post-conviction proceeding, however, raises doubts as to whether it actually was Duncan who engaged in the physical confrontation with DeBaun. The blood evidence shows that someone other than DeBaun and Duncan shed blood in the money room on the night of the murder. Given the testimony at trial that some of DeBaun's injuries indicate that there was a struggle during the attack and that the size of the money room made it unlikely that more than one person actually killed DeBaun or was in the room at the time, the individual who shed blood the night of the murder was in all likelihood the killer. Because the blood evidence does not indicate that Duncan shed blood, but tends to establish that an accomplice did, it undermines our confidence in the jury's finding that Duncan was the actual killer. If the jurors had heard the additional evidence and counsel had presented the accomplice theory, we believe there is a reasonable probability that one or more of them would have had a reasonable doubt that Duncan was guilty of the special circumstance alleged.[10]

---

[10]The district court cited *Spivey v. Rocha*, 194 F.3d 971, 978 (9th Cir. 1999), for the proposition that omitting evidence of third party participation that does not identify a possible suspect is not reason to grant petitioner relief. However, *Spivey* involved a state question about the admissibility of certain evidence in a murder trial. *Id.* at 977. In that case, the defendant claimed in his federal habeas petition that a decision of the state *trial judge* to exclude certain evidence constituted constitutional error. *Id.* The present case involves a completely different question: namely, whether *counsel* was reasonable in failing to investigate available evidence and how that failure prejudiced the defendant's case. Only state evidentiary rulings that render the proceeding so fundamentally unfair as to violate due process are grounds for federal habeas relief. *Id.* at 977-78.

The only remaining question is whether once the jury had a reasonable doubt that Duncan was the killer, a reasonable doubt would also exist as to whether Duncan intended that his accomplice kill DeBaun. Once the jury had determined that Duncan was the actual killer, the jury would also conclude that he intended the killing. So, none of the evidence presented at trial speaks directly to this question. However, the question need not be answered definitively in order for us to find prejudice. We need only determine whether there is a reasonable probability that the outcome of the proceeding would have been different had the additional blood evidence been presented. *See Strickland*, 466 U.S. at 694. In other words, we must determine whether we are confident that the jury, having heard the additional blood evidence that Cheroske should have presented, would unanimously find beyond a reasonable doubt that although Duncan was not the killer, he intended DeBaun's death. We conclude that there is a reasonable probability that at least one juror would have harbored doubt about Duncan's intent, and that undermines our confidence in the special circumstance finding.

The evidence supports the theory that Duncan and his accomplice intended to rob the restaurant after DeBaun left for the night and did not expect to encounter her there. The record indicates that DeBaun worked later than usual on the night of the murder. If so, she may have caught Duncan and his accomplice by surprise. Duncan's accomplice might well have attacked her without Duncan intending that he do so. Alternatively, Duncan and his confederate may have known

That is a much higher standard than the one Duncan must meet to show that Cheroske's assistance was ineffective. More important, in *Spivey*, the only evidence of third party participation was the fact that the victim was a member of a gang and there was no additional evidence linking another perpetrator to the murder. *Id.* at 977. In this case, by contrast, there is forensic evidence that places a third party at the scene of the crime on the night of the murder and demonstrates that the third party was injured during the commission of the crime.

that DeBaun was still in the money room and worn masks to disguise their identities when they entered the restaurant. Although Duncan may have intended only to steal the money and leave DeBaun alive, his accomplice may have decided to kill her without Duncan's consent, when he unexpectedly found her still there or when she put up an unexpectedly strong struggle instead of simply turning over the money. Either of these scenarios would be consistent with the evidence presented at trial and at the state post-conviction proceedings. More important, as the district court acknowledged, if an accomplice killed DeBaun, it would be difficult to establish from the evidence before the jury that Duncan intended that he do so, especially as the State sought to prove that there was only one participant in the robbery and offered no evidence that Duncan intended the accomplice who actually killed DeBaun to murder her.

None of the arguments that the district court or the State offer in opposition to the new blood evidence forecloses the reasonable possibility that at least one juror would have found that Duncan did not intend to kill DeBaun. The fact that DeBaun was Duncan's supervisor and thus surely would have recognized him does not conclusively prove that he intended her death. Duncan is not a sophisticated or strategic criminal as demonstrated by the second theft in which he stole $1700 from the supervisor's bank and revealed his identity as the thief by also stealing $300 from his own cashier bank. Nor does the fact that two knives were used in the attack prove that Duncan assisted in the attack, especially considering the detective's testimony that the money room was too small for two attackers. In fact, the jury convicted Duncan on the theory urged by the State that one attacker wielded two knives against DeBaun.

The district court found that Cheroske's failure to present the additional blood evidence did not prejudice Duncan, but the court applied the incorrect legal standard. Throughout its order, the district court found that petitioner did not present

"conclusive evidence" of his arguments or "establish" crucial facts. (*E.g.,* floor mopping, two attackers, AB blood deposited on the night of the murder). The district court also ruled that the State could have offered "persuasive" evidence rebutting petitioner's arguments. (*E.g.,* AB blood came from accomplice, explanation of two knives, intent to kill). The "conclusive evidence" standard articulated by the district court, as well as the court's speculation about what the prosecution "could have" offered, hold petitioner to a standard well above the "reasonable probability" required by *Strickland.* Even the lesser "more likely than not" or "preponderance" requirements were "explicitly rejected in *Strickland.*" *Sanders*, 21 F.3d at 1461. A requirement that petitioner establish his contentions "conclusively" conflicts directly with *Strickland.* In fact, in order to prevail on this appeal, Duncan need show only that the omitted evidence is sufficient to undermine confidence in the outcome, and he has done so.

Not only was Cheroske's deficient performance with regard to the serology expert and the blood evidence "far less helpful than a competent presentation would have been," but it was also "probably actually harmful" to Duncan's case. *Alcala*, 334 F.3d at 873. In his closing argument, the prosecutor criticized Cheroske for not disclosing Duncan's blood type and implied that his failure to do so was indicative of guilt. He asked the jury: "don't you think that the defense would have taken the blood of this defendant and brought it into court here with their own expert and had them testify to it if they thought there was the *slightest* chance to be able to prove that?" The prosecutor's argument suggested that there existed additional inculpatory evidence that was never presented to the jury—a claim that certainly undermined Duncan's defense. *See id.* at 873 (finding prejudice when the prosecutor capitalized on defense counsel's deficient performance and used it to his advantage in closing arguments).

[16] In sum, Cheroske's failure to properly investigate the blood evidence, test Duncan's blood, and present evidence

that someone other than Duncan and the victim shed blood in the money room on the night of the murder was unreasonable, especially considering that the blood evidence was the only physical evidence that had not been linked to Duncan at the time of the trial. The evidence that Cheroske failed to present would have been highly significant because it would have suggested that Duncan had an accomplice and that the accomplice was likely the actual killer. Under the State's own theory, the small money room likely would have accommodated only one killer. Given the blood found at the crime scene that did not belong to the victim or to Duncan and that was likely shed in the course of the attack, it appears probable that Duncan was not in the money room during the murder.

[17] Duncan has undermined our confidence in the jury's special circumstance finding that he intended to kill and did kill DeBaun because there is a reasonable probability that if the jury had heard the additional blood evidence, at least one juror would have had a reasonable doubt as to the truth of that allegation. For the reasons set forth above, we hold that with respect to the special circumstance finding, the district court erred in concluding that Duncan suffered no prejudice from Cheroske's failure to investigate and present testimony regarding the critical blood evidence.

## Conclusion

We affirm the district court's denial of habeas relief as to Duncan's conviction for first-degree felony murder for the reasons set forth above and in the memorandum disposition filed concurrently herewith. We also hold that the district court erred in concluding that Duncan did not receive ineffective assistance of counsel at the special circumstance phase of his trial. Accordingly, the special circumstance finding must be vacated, and the sentence set aside. The district court shall issue a writ directing the State to institute within 90 days any proceedings necessary to permit a jury to make new special

circumstance findings or, alternatively, to impose a sentence of 25 years to life in prison.

AFFIRMED in part, REVERSED in part, and REMANDED with instructions to issue a writ of habeas corpus.