**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ZACHARY KELSEY,

*Petitioner-Appellant,*

v.

TIM GARRETT; JAMES
DZURENDA; AARON D. FORD,

*Respondents-Appellees.*

No. 22-15557

D.C. No.
3:18-cv-00174-
MMD-CLB

OPINION

Appeal from the United States District Court
for the District of Nevada
Miranda M. Du, Chief District Judge, Presiding

Argued and Submitted December 9, 2022
San Francisco, California

Filed May 24, 2023

Before: Susan P. Graber, Ronald M. Gould, and Paul J.
Watford, Circuit Judges.

Opinion by Judge Gould;
Dissent by Judge Graber

# SUMMARY[*]

## Habeas Corpus

The panel reversed the district court's denial of Nevada prisoner Zachary Kelsey's 28 U.S.C. § 2254 habeas corpus petition challenging his conviction and 10-to-25-year sentence for the second-degree murder of Jared Hyde, and remanded for the district court to issue the writ.

In his habeas corpus petition, Kelsey claimed that he was denied effective assistance of counsel as guaranteed under the Sixth Amendment by his trial counsel, Scott Edwards, waiving closing argument and failing to consult a forensic pathologist expert.

The panel agreed with Kelsey that Edwards' decision to waive closing argument was not based on strategy and that he was prejudiced by counsel's waiver. Addressing deficient performance, the panel wrote that neither reason offered by Edwards during post-conviction proceedings testimony—that he chose to waive closing argument to cut off the possibility that the lead prosecutor would give a more powerful rebuttal closing argument, and to preclude the prosecutor from arguing for first-degree murder—is supported by the record. The panel wrote that the record likewise does not support respondents' asserted justification—never offered by Edwards—that the waiver was a tactic to prevent co-defendants' counsel from presenting closing arguments that would shift blame to Kelsey. The panel wrote that Edwards' decision to waive

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

closing argument was also unreasonable under prevailing professional norms.  The panel held that Kelsey successfully showed that he was prejudiced by Edwards' waiver of closing argument.  Had Edwards made a closing argument, he could have explained that Kelsey's actions were not the proximate cause of Hyde's death and asked the jury to convict, if at all, on a lesser offense.  As this was a joint trial with varying defense theories and degrees of culpability, closing argument was a critical opportunity for Edwards to distinguish and disentangle Kelsey's culpability from that of his co-defendants.  Applying the Antiterrorism and Effective Death Penalty Act (AEDPA), the panel held that Nevada Court of Appeals unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), by accepting Edwards' implausible explanations for waiving closing argument and because there was a reasonable probability of a better outcome for Kelsey if Edwards had given closing argument.

The panel also agreed with Kelsey that Edwards' decision not to consult a forensic pathologist expert was not based on strategy and that Kelsey was prejudiced by this decision.  The panel held that Edwards did not conduct a reasonable investigation.  The central issue at trial was the cause of Hyde's death, and Edwards' defense theory was that Kelsey was guilty at best of simple battery.  But even though he was not an expert in forensic pathology himself, Edwards did not contact, consult with, or present, an expert questioning whether Kelsey's actions caused Hyde's death.  The panel wrote that it was enough that Edwards knew the testifying experts called by co-defendants' counsel would contradict his defense theory and nevertheless failed to present countervailing expert testimony on that subject or even consult with an expert to aid in his cross-examination and trial preparation.  Addressing prejudice, the panel wrote

that it is reasonable to conclude that, presented with an expert in disagreement with testifying experts, at least one juror would have been swayed to have a reasonable doubt because of the disagreeing expert, and that there is thus a reasonable probability that the jury would have returned with a different sentence. As the Nevada Court of Appeals did not address whether Edwards was deficient for failing to consult a forensic pathologist expert, the panel applied AEDPA deference only to its analysis of the prejudice prong. The panel held that the Nevada Court of Appeals' and the state district court's decisions involved an unreasonable application of *Strickland* because they did not accord appropriate weight to the potential force of countervailing expert testimony in this case where causation was so critical and because they failed to consider the combined prejudicial effect of both deficiencies (waiver of closing argument and failure to consult with an expert).

Dissenting, Judge Graber wrote that Edwards made tactical decisions that neither fell below an objective standard of reasonableness nor prejudiced Kelsey, and that the state court's denial of his habeas petition therefore was not an unreasonable application of *Strickland*. She wrote that in concluding that Edwards was ineffective because he waived closing argument and because that decision prejudiced Kelsey, the majority opinion fails to give proper deference to the decisions of Kelsey's trial counsel *and* to the decision of the state court. She wrote that not only was the decision to waive closing argument objectively reasonable in the circumstances, it also is essentially the same strategy that the Supreme Court approved in *Bell v. Cone*, 535 U.S. 685 (2002). Concerning Edwards' failure to consult a forensic pathologist, Judge Graber wrote that Edwards already possessed reports from two well-respected

experts and both concluded that Kelsey's actions could have contributed *directly* to the victim's death; that a third expert, whom the majority chides Edwards for failing to call, recognized that Kelsey's actions could have been a *substantial factor* in the victim's death; and that Kelsey is guilty of the crime of conviction even if his acts were only a "substantial factor" in the killing. She wrote that this court should not expand *Strickland* to stand for the proposition that a defense attorney always must consult with an expert when the government puts forth its own expert. She wrote that the majority opinion also fails to explain precisely how consultation with any forensic expert would have resulted in a different outcome at trial.

## COUNSEL

Kimberly Sandberg (argued), Assistant Federal Public Defender; Rene L. Valladares, Federal Public Defender, District of Nevada; Public Defenders' Office; Las Vegas, Nevada; for Petitioner-Appellant.

Erica Berrett (argued), Deputy Attorney General; Office of the Nevada Attorney General; Las Vegas, Nevada; Charles L. Finlayson, Senior Deputy Attorney General; Aaron D. Ford, Attorney General of Nevada; Office of the Nevada Attorney General; Carson City, Nevada; for Respondents-Appellees.

**OPINION**

GOULD, Circuit Judge:

Zachary Kelsey appeals the district court's denial of his 28 U.S.C. § 2254 habeas corpus petition challenging his conviction and 10-to-25-year sentence for the second-degree murder of Jared Hyde. We reverse and remand.

At trial, Kelsey was tried with two co-defendants, Robert Schnueringer and Andrue Jefferson, each of whom had their own counsel. Kelsey's trial counsel, Scott Edwards, did not consult with or retain a forensic pathologist regarding Hyde's cause of death. Then, prompted by counsel for Schnueringer, Edwards agreed to waive closing argument. In post-trial proceedings, Edwards testified that he did not consult a forensic pathologist because Schnueringer's attorney told him that he had talked to an expert and that her opinion "wasn't good." Edwards stated that he agreed to waive closing argument to avoid giving the prosecutor a chance to argue for first-degree murder in rebuttal.

In his habeas corpus petition, Kelsey claimed that he was denied effective assistance of counsel as guaranteed under the Sixth Amendment. The state district court granted Kelsey's petition on the claim that his trial counsel was ineffective in failing to give a closing argument, but the Nevada Court of Appeals reversed. The federal district court denied habeas relief. We have jurisdiction under 28 U.S.C. § 1291 and 28 U.S.C. § 2253; we reverse and order the district court to issue the writ of habeas corpus.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### a.  The death of Jared Hyde

On February 4, 2012, Kelsey went to a bonfire party attended by forty to sixty individuals in their teens and early twenties.  During the party, fights broke out.  One was between Kelsey and Jared Hyde, the victim.

At trial, four individuals testified about the fight between Kelsey and Hyde: three attendees of the bonfire party—Mike Opperman, Brandon Nastaad, and Aubree Hawkinson— along with Kelsey himself.  Opperman, Nastaad, and Hawkinson all testified that they saw Kelsey hit Hyde in his face two to three times.  Naastad testified that he saw Hyde pulling Kelsey's shirt off of him and then saw Kelsey punch Hyde in the face three times.  Opperman testified that Kelsey's hits knocked Hyde down.  Kelsey testified that he punched Hyde twice and only tried to kick him after Hyde grabbed Kelsey's shirt.  Some witnesses of the fight testified that Kelsey later bragged about wearing brass knuckles during the fight, but no one testified that they actually saw him wearing them.  Hyde's friend Tyler DePriest testified that, after the fight between Kelsey and Hyde was over, Hyde walked toward DePriest's vehicle and told him, "I just got rocked.  Let's get out of here, let's go."

As Hyde walked around to the passenger side of the car, he was confronted by Schnueringer and Jefferson, who asked if Hyde was "still talking smack," and Hyde responded that he was not.  Hyde did not have his hands up to defend himself when Schnueringer punched him in the head, the sound of which witnesses compared to the crack of a baseball bat.  Hyde's knees buckled and he fell to the ground.  While Hyde was unconscious on the ground, Jefferson punched him in the head again.  Schnueringer and Jefferson

proceeded to stomp on Hyde's head, while Jefferson shouted, "I slept him. I slept him." When a friend of Hyde's checked Hyde for a pulse, he did not find one. Hyde's friends drove him to the hospital. Hyde was not breathing when they arrived at the hospital and efforts to resuscitate him failed.

### b. Expert Opinions

Dr. Ellen Clark performed Hyde's autopsy and she determined that "[t]he cause of death was bleeding into the brain . . . due to blunt force trauma." Dr. Clark explained that "[t]here were multiple injuries to different parts of the brain" such that she could not "identify one fatal impact site" because "based upon the cumulative effect or the compounding injury, any and all of the blows may have contributed to causing death." Dr. Clark consulted with Dr. Bennet Omalu, a forensic pathologist, neuropathologist, and a "recognized and leading expert in brain trauma," to get his opinion of Hyde's cause of death. Similar to Dr. Clark, Dr. Omalu testified about "repetitive traumatic brain injury," meaning "each and every repeated blow accentuates the totality of all the blows" such that it cannot be determined "which blow was the fatal blow."

In sharp contrast, at Kelsey's post-conviction hearing, a pathologist named Dr. Amy Llewellyn testified that, after reviewing Hyde's autopsy report and photographs, Dr. Clark and Dr. Omalu's trial testimonies, and various witness statements, she did not agree with Dr. Omalu's conclusion that every single hit necessarily contributed to Hyde's death. She testified that she thought, "to a reasonable degree of medical certainty," that it was the second attack by Schnueringer and Jefferson that killed Hyde. That conclusion accords with common sense. It is one thing for a

teenager at a party to throw and land a punch to someone's head.  But it is quite another thing, and clearly more extreme, for two teenagers to repeatedly beat someone in the head multiple times.  There is a difference between a typical high school fight of teenagers, and a savage, brutal beating delivering repeated blows to a helpless victim's head.

### c.  Prior State and Federal Proceedings

#### i.  *Nevada State Courts*

On direct appeal, the Nevada Supreme Court affirmed Kelsey's judgment of conviction and sentence.  Kelsey sought post-conviction relief.  The state district court granted Kelsey's petition on the claim that his trial counsel was ineffective in failing to give a closing argument, but the Nevada Court of Appeals reversed.  Kelsey then pursued relief in federal court.

#### ii.  *Federal Habeas Corpus*

The United States District Court for the District of Nevada denied Kelsey's habeas petition and initially denied him a certificate of appealability.  Kelsey appealed, and we granted a certificate of appealability with respect to whether his trial counsel was ineffective.  We also granted Kelsey's motion for remand because certain documents were not submitted to, and thus not reviewed by, the district court.  On remand, the district court reaffirmed its prior denial of Kelsey's habeas petition, but it granted a certificate of appealability for whether Kelsey's trial counsel was ineffective for (a) waiving closing argument and/or (b) failing to consult with or retain an expert regarding the victim's cause of death.

## II.    STANDARD OF REVIEW

We review a district court's denial of a habeas petition *de novo*. *Godoy v. Spearman*, 861 F.3d 956, 961-62 (9th Cir. 2017) (en banc).   Because Kelsey filed his petition after April 24, 1996, the Antiterrorism and Effective Death Penalty Act ("AEDPA") applies to review of this petition. *See Summers v. Schriro*, 481 F.3d 710, 712 (9th Cir. 2007). Under AEDPA, when a state court has adjudicated a claim on the merits, a federal court may grant habeas relief only if the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(1)-(2).   When the state court does not reach a particular issue, § 2254 does not apply, and we review that issue *de novo*.  *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *see also Weeden v. Johnson*, 854 F.3d 1063, 1071 (9th Cir. 2017) ("Because the [state court] did not reach the issue of prejudice, we address the issue de novo.").

## III.    DISCUSSION

A defendant claiming ineffective assistance of counsel ("IAC") must demonstrate: (1) that counsel's performance was deficient and (2) that the defendant was prejudiced by reason of counsel's actions. *Strickland v. Washington*, 466 U.S. 668, 687-90 (1984).

Regarding the first prong, counsel's performance was deficient if it "fell below an objective standard of reasonableness . . . . under prevailing professional norms." *Id.* at 688.   There is a strong presumption that counsel rendered adequate assistance, and "strategic choices made

after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690-91. However, the purpose of these inquiries is to ensure that criminal defendants receive a fair trial, so we analyze IAC claims "considering all the circumstances." *Id.* at 688-89.

Regarding the second prong, we consider "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. "A reasonable probability is one 'sufficient to undermine confidence in the outcome,' but is 'less than the preponderance more-likely-than-not standard.'" *Lambright v. Schriro*, 490 F.3d 1103, 1121 (9th Cir. 2007) (quoting *Summerlin v. Schriro*, 427 F.3d 623, 640, 643 (9th Cir. 2005) (en banc)). It is not necessary to show that counsel's deficient conduct "more likely than not altered the outcome in the case." *See Duncan v. Ornoski*, 528 F.3d 1222, 1239 (9th Cir. 2008) (quoting *Sanders v. Ratelle*, 21 F.3d 1446, 1461 (9th Cir. 1994)).

In addition to defining these standards, the *Strickland* Court set guidance for their application, reminding lower courts that, "[a]lthough [the *Strickland* standards] should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." 466 U.S. at 696.

There is a large amount of deference owed in this case. Review of an IAC claim under § 2254(d) is "doubly deferential," requiring the court to apply AEDPA deference on top of *Strickland* deference. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). However, a federal habeas court may grant the writ if it concludes that the state court decision was "contrary to" or "involved an unreasonable application of" clearly established federal law. 28 U.S.C. § 2254(d)(1).

"[C]ontrary to" means that "the state court applie[d] a rule different from the governing law set forth in [the Supreme Court's] cases" or that it "decide[d] a case differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). "[U]nreasonable application" means that "the state court identifie[d] the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applie[d] that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.

### a. Waiving closing argument

Kelsey argues that his trial counsel was ineffective for waiving closing argument. He argues that Edwards' decision to waive closing argument was not based on strategy and that he was prejudiced by Edwards' waiver. *Id.* We agree.

Edwards testified that the reason he waived closing argument was because he did not think the junior prosecutor's closing argument was "the most vigorous closing argument [he] had ever seen," and he didn't want to give the more senior prosecutor an opportunity to argue for first-degree murder in rebuttal. John Ohlson, counsel for Kelsey's co-defendant Schnueringer, was the one who initially suggested waiving closing argument. Edwards, understanding that all three attorneys had to waive closing to keep the prosecution from getting a rebuttal, agreed to Ohlson's suggestion.

The state district court held that Edwards was deficient for waiving closing argument and that the waiver prejudiced Kelsey, but the Nevada Court of Appeals reversed. The Nevada Court of Appeals' reversal was based on its

conclusion that while choosing to forgo closing argument "may not have been the best option, it was a tactical decision," and that Kelsey failed to demonstrate prejudice.

### i.    *Deficient performance*

Closing arguments are a crucial part of trial.  As the Supreme Court emphasized in *Herring v. New York*, "no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment."  422 U.S. 853, 862 (1975).  While "[c]losing arguments should 'sharpen and clarify the issues for resolution by the trier of fact,' . . . which issues to sharpen and how best to clarify them are questions with many reasonable answers." *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (per curiam) (quoting *Herring*, 422 U.S. at 862).  As pointed out by Respondents, it is true that sometimes it might make sense to "forgo closing argument altogether."  *Id.*  But even if waiving closing argument can, in some cases, be a tactical decision, it was not one in this case.

As a threshold matter, Kelsey's co-defendants, Jefferson and Schnueringer, presented defenses that were directly adversarial to Kelsey's, such that it was questionable for Edwards to rely on Ohlson's strategic assessment.  At every turn, Ohlson and Molezzo (counsel for Jefferson) sought to inculpate Kelsey in order to exonerate their clients.  Indeed, Ohlson presented a theory of the case that was arguably even more extreme than the State's with respect to Kelsey's culpability, repeatedly emphasizing Kelsey's alleged use of brass knuckles.

During the Nevada post-conviction proceedings, Edwards testified that he chose to waive closing argument to cut off the possibility that the lead prosecutor would give a

more powerful rebuttal closing argument and to preclude the prosecutor from arguing for first-degree murder. Neither reason is supported by the record. Edwards himself acknowledged that the State never argued for first-degree murder during its initial closing and could not have credibly argued that Kelsey was guilty of first-degree murder in rebuttal. As for the desire to avoid a more persuasive rebuttal, there is no concrete indication in the record that the lead prosecutor would be the person to argue the State's rebuttal, and, more importantly, there is no indication that anything was left unsaid in the State's initial closing argument. As the Nevada district court emphasized in granting Kelsey post-conviction relief, the prosecution's initial closing argument was not brief. It lasted for approximately two hours, over which time the State reviewed virtually every aspect of the trial in detail. Given the length and comprehensiveness of the State's initial closing argument, it was entirely unreasonable to think that the State had saved its best for last.

Respondents advance an additional reason that Edwards' decision to waive closing argument was tactical, namely to prevent Molezzo and Ohlson from presenting closing arguments that would shift blame to Kelsey by highlighting his alleged use of brass knuckles. But Edwards never offered that as a reason justifying his decision to waive closing argument, and the record does not support that asserted justification in any event.

Although Ohlson attempted at trial to elicit testimony that Kelsey had used brass knuckles and bragged about killing Hyde, Ohlson testified during post-conviction proceedings that the witnesses he put on the stand had been thoroughly discredited by the end of the trial. In fact, Ohlson testified that he had waived closing argument to avoid the

possibility that the damage done to the credibility of those witnesses would "rub off" on his client. During its closing argument, the prosecution picked apart the credibility of Ohlson's witnesses, telling the jury that parts of their story didn't "make sense," and that the brass knuckles testimony was unfounded. Thus, any supposed desire to prevent counsel for Kelsey's co-defendants from presenting closing arguments could not have supported Edwards' decision to waive closing argument on Kelsey's behalf.

*Bell v. Cone*, on which Respondents rely, does not change our conclusion. In that case, the Supreme Court held that a Tennessee state court's determination that counsel was not ineffective for waiving closing argument during the sentencing stage of proceedings did not involve an unreasonable application of *Strickland*. 535 U.S. at 688-87. The Court's holding was based on an analysis of the evidence defense counsel had presented during the guilt stage of proceedings, how close in time the trial was to the sentencing hearing, and the tactical choice with which counsel was faced.

The petitioner in *Bell* was tried and convicted for the brutal murder of an elderly couple. *Id.* at 689. The killings culminated a "2-day crime rampage," *id.*, that also included robbing a jewelry store, shooting a police officer, shooting a citizen, and trying to hijack a car by attempting to shoot its driver, *id.* There was "overwhelming physical and testimonial evidence showing that [petitioner] had perpetrated the crimes and killed the [victims] in a brutal and callous fashion." *Id.* The State had "near conclusive proof of guilt on the murder charges as well as extensive evidence demonstrating the cruelty of the killings." *Id.* at 699.

At trial, defense counsel conceded that Cone had committed most of the acts in question but sought to prove that he was not guilty by reason of insanity. *Id.* at 690. Counsel presented extensive mitigating evidence during the guilt stage of the proceedings. *Id.* Defense experts testified to the petitioner's post-traumatic stress disorder developed while serving in Vietnam and to the petitioner's chronic amphetamine psychosis, hallucinations, and paranoia, which affected his ability to obey the law. *Id.* Petitioner's mother testified that Vietnam had changed her son and spoke about the deaths of his father and fiancée while he was serving an eight-year prison sentence for robbery.

The day after the trial concluded, a three-hour sentencing hearing took place. *Id.* The trial judge explicitly advised the jury that even though the evidence at trial was insufficient to establish an insanity defense, it could be considered as mitigation evidence at sentencing. *Id.* at 691. According to the Court, the prosecution's evidence at sentencing was not "particularly dramatic or impressive." *Id.* at 701. And, at the close of the hearing, the junior prosecuting attorney gave a brief "low-key" closing, *id.* at 692, that "did not dwell on any of the brutal aspects of the crime," *id.* at 701.

Upon hearing that closing argument, defense counsel waived his own closing argument to prevent the lead prosecutor, who was regarded as "an extremely effective advocate," from arguing in rebuttal. *Id.* at 692. Defense counsel's choice to prevent the prosecution from "depict[ing] his client as a heartless killer, just before the jurors began deliberation," *id.* at 702, the Court explained, was reasonable—under those circumstances, counsel reasonably could have relied "on the jurors' familiarity with the case and his opening plea for life made just a few hours before," *id.*

Respondents argue that the facts of this case are identical to those in *Bell*, and that the outcome in *Bell* precludes relief here. We disagree. Even assuming Edwards' strategy was similar to counsel's strategy in *Bell*, a strategy that is sufficient in one case can be deficient in another case. *See Strickland*, 466 U.S. at 690 (explaining that courts must assess reasonableness "in light of all the circumstances").

In *Bell*, defense counsel's waiver of closing argument was a tactical decision because he knew that the lead prosecutor was going to deliver the rebuttal and all he could do on closing was repeat arguments from his opening statement (which he had delivered only a "few hours before") and "impress upon the jurors the importance of what he believed were less significant facts." *See* 535 U.S. at 701-02. By contrast, Edwards waived closing argument only because Ohlson suggested that they do so—before their conversation during the lunch break, Edwards had prepared to give a closing. Edwards claimed that the "strategy" behind waiving closing was to keep the prosecutor from arguing first-degree murder, but Edwards acknowledged that the junior prosecutor was "[n]ot at all" arguing for a first-degree conviction for Kelsey in her approximately two-hour-long opening remarks.

Further, unlike in *Bell*, Edwards' defense was not thorough without closing argument—Edwards had purposefully left details out of his opening statement (delivered over a week prior) because he planned to use closing argument to "come back" to the jury to explain how "[t]his is not a murder case, at least from Zach Kelsey's perspective." Because he waived closing, Edwards also gave up the ability to address the jury on the proximate cause, misdemeanor battery, and involuntary manslaughter instructions he had prepared, all of which were central to his

theory of the defense.  At trial, the only witness Edwards called was Kelsey, and, unlike in *Bell* where defense counsel had presented extensive mitigating evidence just the day before, closing argument was the only opportunity for Edwards to present his defense that Kelsey was not guilty of second-degree murder and to differentiate Kelsey's culpability from that of Jefferson and Schnueringer.  *See Herring*, 422 U.S. at 862 ("[I]t is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole.").

Edwards' decision to waive closing argument was also unreasonable under prevailing professional norms.  While there is no ABA Guideline addressing the potential waiver of closing argument, Ohlson and Edwards were both seasoned defense attorneys at the time of Kelsey's trial, and thus, their experiences can give us some indication of the profession's "norms."  *See Wiggins v. Smith*, 539 U.S. 510, 523, 524-25 (2003) (looking to the ABA Guidelines to define "prevailing professional norms.").  Before this trial, Ohlson had defended more than 30 murder cases that went to trial and Edwards had tried at least 20 cases to verdict as a defense attorney.  This trial was the first time that either attorney had ever waived closing argument, and for Edwards, "[it] might be the last."  Ohlson admitted that he would not have waived closing argument if he were Kelsey's attorney.

In sum, the importance of closing argument to Kelsey's case cannot be overstated.  While waiving closing argument may have been a tactical choice for Ohlson, the purportedly tactical reasons Edwards offered after the fact do not withstand even moderate scrutiny and are not reasonable in light of prevailing professional norms.

### ii.    Prejudice

We hold that Kelsey successfully showed that he was prejudiced by Edwards' waiver of closing argument.  Had Edwards made a closing argument, he could have explained that Kelsey's actions were not the proximate cause of Hyde's death and asked the jury to convict, if at all, on a lesser offense.

In *Herring*, the Supreme Court highlighted the importance of closing arguments to the "adversary factfinding process."  *See* 422 U.S. at 858 ("The right to the assistance of counsel has thus been given a meaning that ensures to the defense in a criminal trial the opportunity to participate fully and fairly in the adversary factfinding process.  There can be no doubt that closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial.").  Closing argument is all the more important in a trial as lengthy as the one in this case, which lasted for over seven days and included over twenty witnesses and over fifty exhibits.

Here, taking into consideration the combined effect of failing to consult an expert and waiving closing argument in a joint trial, we conclude that Edwards "entirely failed" to oppose the prosecution.  Because he did not present an expert of his own and did not give a closing argument, at no point during trial did Edwards have an opportunity to differentiate his client from the other defendants in the case and argue for, ideally, simple battery or, at worst, involuntary manslaughter.  The jury received instructions on the lesser offenses, but Edwards never explained them to the jury, though he clearly intended to do so initially.  In his opening statement, Edwards told the jury that "after [they] hear[d] all the evidence," he was going to ask them to

conclude that Kelsey did not murder Hyde. Edwards promised that he would "come back" to the jury and "discuss the evidence again," but by waiving closing argument, Edwards never did "come back" to the jury as he had promised.

As this was a joint trial with varying defense theories and degrees of culpability—unlike in *Bell* and *Yarborough*—closing argument was a critical opportunity for Edwards to distinguish and disentangle Kelsey's culpability from that of his co-defendants. Instead, by the end of the trial, Edwards' defense seemed no different than those presented by counsel for Kelsey's co-defendants, despite their defense theories being completely different. This was a grave deficiency in the defense causing prejudice to Kelsey.

### iii.  AEDPA

The Nevada Court of Appeals correctly identified *Strickland* as the relevant "clearly established federal law" for an IAC claim, but the Nevada court then unreasonably applied *Strickland* to Kelsey's case.

First, as to the deficient performance prong of *Strickland*, the Nevada court unreasonably applied *Strickland* when it accepted Edwards' implausible explanations for waiving closing argument. *Strickland* requires courts to evaluate counsel's decisions for reasonableness in light of counsel's "perspective at the time of the alleged error . . . and in light of all of the circumstances." 466 U.S. at 689; *see Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986); *see also id.* at 386 (noting that "counsel offered only implausible explanations" for his challenged failure). Here, Edwards' decision to waive closing argument was unreasonable for all of the reasons stated above.

Edwards said that he agreed to waive closing argument because he did not want to give the prosecutor an opportunity to argue for first-degree murder in rebuttal. The Nevada court accepted this explanation as tactical in nature, but it was implausible that the prosecution would argue for first-degree murder in rebuttal. The junior prosecutor had only advocated for second-degree murder during her two-hour-long opening remarks and had "[n]ot at all" argued for or suggested a first-degree murder conviction for Kelsey. Similarly, the Nevada court reasoned that Edwards' decision was tactical because he feared that the State's rebuttal would be "much more persuasive," but that fear is similarly unsubstantiated given the exhaustive nature of the State's initial closing. The Nevada court unreasonably applied *Strickland* by not evaluating Edwards' decision to waive closing argument for reasonableness.

Second, as to the prejudice prong, the Nevada court unreasonably applied *Strickland* because there was a "reasonable probability" of a better outcome for Kelsey if Edwards had given closing argument. 466 U.S. at 694. Edwards had prepared jury instructions regarding proximate causation, simple battery, and involuntary manslaughter, but as explained above, he waived the opportunity to explain those instructions and to ask the jury to find Kelsey guilty of one of these lesser offenses. Closing argument was Edwards' only chance to present his theory of the case to the jury and to explain his jury instructions. If Edwards had not given up this critical opportunity to address the jury, there is a reasonable probability that the outcome of this case would have been different for Kelsey, especially considering the combined effect of failing to consult with an expert in a joint trial with varying degrees of culpability.

### b.  Not consulting a forensic pathologist expert

Kelsey argues that Edwards was ineffective for failing to consult a forensic pathologist expert.  He argues that Edwards' decision not to consult an expert was not based on strategy and that he was prejudiced by this decision.  Again, we agree.

### i.    *Deficient performance*

"[Counsel] has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at 691.  "Strategic" choices made after "less than complete investigation" are reasonable only to the extent that "reasonable professional judgments support the limitations on investigation."  *Id.* at 690-91; *see also Harrington v. Richter*, 562 U.S. 86, 106 (2011) ("Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence . . . ."); *Duncan*, 528 F.3d at 1235 ("[W]hen the prosecutor's expert witness testifies about pivotal evidence or directly contradicts the defense theory, defense counsel's failure to present expert testimony on that matter may constitute deficient performance."); *Jennings v. Woodford*, 290 F.3d 1006, 1014 (9th Cir. 2002) ("[A]ttorneys have considerable latitude to make strategic decisions about what investigations to conduct *once they have gathered sufficient evidence upon which to base their tactical choices*.").

In *Duncan v. Ornoski*, we held that counsel's performance was deficient because he failed to consult an expert on potentially exculpatory evidence.  528 F.3d at 1235.  In the murder case, counsel's defense theory was that his client did not kill the victim.  *Id.*  However, without consulting and presenting an expert, counsel was unable to

either present specific evidence that his client was not the murderer or advance a plausible alternative defense theory. *Id.* We found counsel's failure to consult an expert to be particularly deficient because he did not have any "knowledge or expertise" about the field of serology and there were blood samples that, if tested, could have shown Duncan was not the murderer. *Id.* Counsel had an "increased" duty to seek the assistance of an expert because the potentially exculpatory evidence to be gained from consultation with an expert could have played a "central role" at trial. *Id.* at 1236. Had counsel consulted an expert, he would have been in a position to make strategic choices about whether to share the expert's findings, but without expert consultation, he had "no basis on which to devise his defense strategy." *Id.*

In *Wiggins v. Smith*, the Supreme Court held that the petitioner's counsel's decision not to expand their investigation beyond a presentence report and certain records fell short of prevailing professional standards and prejudiced the petitioner. 539 U.S. at 524. Counsel did not present any additional mitigating evidence from the petitioner's background even though there was plenty of mitigating evidence available. *Id.* at 525. The Court held that counsel's performance was deficient for conducting an "unreasonable investigation." *Id.* at 528. Counsel argued that it was a tactical decision not to focus on the petitioner's background at sentencing, but the Court found that counsel "were not in a position to make a reasonable strategic choice . . . because the investigation supporting their choice was unreasonable." *Id.* at 536. The Court found counsel's investigation to be "incomplete" and the result of "inattention, not reasoned strategic judgment." *Id.* at 534.

Here, Edwards did not conduct a reasonable investigation. The central issue at trial was the cause of Hyde's death, and Edwards' defense theory was that "[Kelsey] was guilty at best of the lesser included offense of simple battery and that he was not guilty of murder." But even though he was not an expert in forensic pathology himself, Edwards did not contact, consult with, or present, an expert questioning whether Kelsey's actions caused Hyde's death. *See Duncan*, 528 F.3d at 1235-36. Like in *Duncan*, where the potentially exculpatory blood evidence could have played a "central role," expert testimony like that of Dr. Llewellyn or Dr. Terri Haddix, with whom Ohlson had consulted, could have been central to Edwards' defense of Kelsey. *Id.* at 1236. This was clear to Ohlson, who explained that he did not share the views of Dr. Haddix with Edwards because he felt the information was "possibly exculpatory to Mr. Edwards' client, [but] was inculpatory to Mr. Molezzo's and more particularly to [his own] client." Respondents argue that Edwards was not ineffective because Dr. Llewellyn's testimony was not exculpatory, but there is no requirement that potential information from the forgone investigation be game-changing. It is enough that Edwards knew the testifying experts—Dr. Clark and Dr. Omalu— would contradict his defense theory and nevertheless failed to present countervailing expert testimony on that subject or even to consult with an expert to aid in his cross-examination and trial preparation. *See Duncan*, 528 F.3d at 1235-36.

Edwards' decision not to consult with a forensic pathologist expert was unreasonable. Like in *Wiggins*, where counsel was not in a position to make a strategic decision, Edwards was not in a position to make a strategic decision about presenting expert testimony because he did not even contact or consult with an expert. *See* 539 U.S. at

536. Had Edwards consulted with an expert and *then* decided to not have that expert testify at trial, our analysis would be different. But instead, Edwards simply relied upon Ohlson's assessment that Dr. Haddix's expert opinion would not be good for the defense. This was not a tactical decision because Edwards had not gathered sufficient evidence to make a sound strategic decision.

### ii. Prejudice

In *Duncan*, we held that counsel's failure to investigate potentially exculpatory blood samples prejudiced his client because had counsel conducted a proper investigation, "it is likely that at least one juror would have had a reasonable doubt" about his client's guilt. 528 F.3d at 1244. We reasoned that had counsel consulted an expert, he would have been better prepared for aspects of trial such as the cross-examination of the State's expert. *Id.* at 1241. Without expert consultation regarding the potentially exculpatory evidence, all the physical evidence presented at trial suggested that the defendant was guilty. *Id.* at 1246. Because counsel did not consult with or call an expert, the jury did not get to hear "convincing evidence" that would have supported counsel's defense theory. *Id.* at 1241.

During the state post-conviction proceedings, Dr. Llewellyn testified that, to a reasonable degree of medical certainty, Schnueringer and Jefferson's attack caused Hyde's death. While she said it was *possible* that Kelsey's punches caused or contributed to Hyde's death, Schnueringer and Jefferson's attack was the more probable cause. Significantly, Dr. Llewellyn testified that all of Hyde's injuries could be attributed to Schnueringer and Jefferson's attack, but that she could not conclude that Hyde's injuries were caused solely by Kelsey. She testified

that Schnueringer's punch, which sounded like the crack of a baseball bat, was a very severe blow, and that Hyde's injuries were consistent with stomping.  She testified that there were no distinctive marks on Hyde to indicate that he had been hit with brass knuckles.  Finally, she testified that she disagreed with Dr. Omalu's finding that every punch necessarily contributed to Hyde's death.  This testimony would have been powerful evidence for the jury, especially when confronted with the witness testimony describing how different Kelsey's fight with Hyde was from the attack on Hyde by Schnueringer and Jefferson.

The difference between: (a) presenting testimony by an expert like Dr. Llewellyn or Dr. Haddix alongside the testimonies of Dr. Clark and Dr. Omalu versus (b) only presenting the testimonies of Dr. Clark and Dr. Omalu is sufficient to undermine confidence in Kelsey's conviction of second-degree murder.  Like in *Duncan*, where counsel's failure to consult an expert resulted in the jury not being able to hear convincing evidence supporting counsel's defense theory, had Edwards presented a forensic pathologist expert of his own, the jury would have heard about the difference in injuries from face-to-face fights (like that between Kelsey and Hyde) and more brutal attacks involving kicking someone in the head while they are down (like Schnueringer and Jefferson's attack on Hyde).  *See* 528 F.3d at 1241.

Even under Respondents' version of the facts—that Kelsey hit Hyde in the face twice and then kneed him in the head twice after Hyde fell down—Dr. Llewellyn opined that Kelsey's actions were less likely than the actions of Schnueringer and Jefferson to have caused the fatal bleeding in Hyde's brain.  The jury did not get to hear this testimony.  Instead, like in *Duncan*, where the jury did not get to hear about any physical evidence indicating the defendant's

innocence, they heard no disagreement with the opinions of Dr. Clark and Dr. Omalu. It is reasonable to conclude that, presented with an expert in disagreement with Dr. Clark and Dr. Omalu, at least one juror would have been swayed to have a reasonable doubt because of the disagreeing expert. Thus, there is a reasonable probability that the jury would have returned with a different sentence.

### iii.   AEDPA

The Nevada Court of Appeals did not address whether Edwards was deficient for failing to consult a forensic pathologist expert, so § 2254 deference is only owed to its analysis of the prejudice prong. *See Rompilla*, 545 U.S. at 390. The Nevada Court of Appeals held that substantial evidence supported the district court's decision that "Kelsey failed to demonstrate a reasonable probability of a different outcome at trial had counsel presented an expert" because Dr. Llewellyn "could not establish which arteries caused the hemorrhaging in the victim's brain and her testimony could not be differentiated from that of the experts presented by the State."

The Nevada Court of Appeals' and the state district court's decisions involved an unreasonable application of clearly established federal law because they did not accord appropriate weight to the potential force of countervailing expert testimony in this case where causation was so critical and because they failed to consider the combined prejudicial effect of both deficiencies (waiver of closing argument and failure to consult with an expert).

The Nevada courts' analyses focused primarily on the potential effect of Edwards' failure to call Dr. Llewellyn specifically. But Kelsey was not prejudiced solely by his counsel's failure to call Dr. Llewellyn; he was prejudiced by

his counsel's failure to contact, consult with, or call *any expert at all*.  There is, at least, a reasonable probability that the outcome of this case would have been different if Edwards had consulted with a forensic pathologist expert because countervailing expert testimony could have been exculpatory for Kelsey.  Causation was the central issue at trial, and a countervailing expert like Dr. Llewellyn could have clearly explained the difference in injuries from teenage fistfights and involuntary attacks.

The Nevada courts considered each instance of deficient performance by counsel independently and did not consider the combined prejudicial effect of the two deficiencies.  This was an unreasonable application of *Strickland*.  The prejudice prong of *Strickland* asks whether "the decision reached would reasonably likely have been different absent the errors."  466 U.S. at 696.  In addition to using "errors," i.e., the plural form of the word, it is clear that courts are to consider the combined prejudicial effect of multiple errors because the prejudice prong concerns the ultimate decision at trial.  In making decisions, courts consider the totality of the evidence before the judge or jury, so it is clear that a *Strickland* prejudice determination should be based upon the total effect of all of counsel's errors.

In this case, although Edwards' defense was that Kelsey was not the proximate cause of Hyde's death and that he was guilty at most of misdemeanor battery or involuntary manslaughter, Edwards never presented that defense to the jury.  The jury never heard from a defense expert that Kelsey's blows were, to a reasonable degree of medical certainty, not fatal.  And at the end of the trial, the jury was asked by the State to find all three defendants guilty of second-degree murder, without any opposition from the defense because Edwards waived closing argument at the

behest of a clear adversary. While waiving closing might have made sense for Jefferson and Schnueringer, it was catastrophic for Kelsey, whose defense was premised on the fact that his actions were entirely distinguishable from Schnueringer and Jefferson's. On these facts, we conclude that, particularly given the combined effect of Edwards' decision to waive closing argument, Kelsey was prejudiced by Edwards' failure to consult a forensic pathologist expert.

## IV.    CONCLUSION

**REVERSED** and **REMANDED** with instructions to issue the writ of habeas corpus.

---

GRABER, Circuit Judge, dissenting:

I respectfully dissent. Scott Edwards, trial counsel for Petitioner Zachary Kelsey, made tactical decisions to waive closing argument and to forgo consulting a forensic pathologist. Those decisions neither fell below an objective standard of reasonableness nor prejudiced Petitioner. Therefore, the state court's denial of Petitioner's habeas petition was not an unreasonable application of Strickland v. Washington, 466 U.S. 668 (1984). I would affirm.

### A.    Waiver of Closing Argument

The majority opinion concludes that Petitioner's trial counsel was ineffective because he waived closing argument and because that decision prejudiced Petitioner. Maj. Op. at 9. But the majority opinion fails to give proper deference to the decisions of Petitioner's trial counsel and to the decision of the state court. Under 28 U.S.C. § 2254(d), review of an ineffective-assistance-of-counsel claim is "doubly

deferential," requiring deference under both the Antiterrorism and Effective Death Penalty Act ("AEDPA") and Strickland. Knowles v. Mirzayance, 556 U.S. 111, 123 (2009). Overcoming the deference owed under Strickland is no easy task. "[E]ven if there is reason to think that [trial] counsel's conduct 'was far from exemplary,' a court still may not grant relief if '[t]he record does not reveal' that counsel took an approach that no competent lawyer would have chosen." Dunn v. Reeves, 141 S. Ct. 2405, 2410 (2021) (quoting Burt v. Titlow, 571 U.S. 12, 22–23 (2013))(emphasis added).

Edwards testified that he had prepared a closing argument but decided to forgo it because the junior prosecutor presented a lackluster closing argument. By waiving closing argument, Edwards deprived the senior prosecutor of the opportunity to give a compelling rebuttal. Edwards reasonably was concerned about the jurors' hearing a rebuttal from the senior prosecutor, as Edwards had seen him vigorously cross-examine defense witnesses throughout trial.

The majority opinion suggests that Edwards' strategy was imprudent because it seemingly was informed by a mistaken belief that the senior prosecutor would argue in favor of a first-degree murder conviction for Petitioner— even though the junior prosecutor had not done so in her closing argument. Maj. Op. at 10–11, 15. Although Edwards testified that the possibility of such an argument "went into [his] calculation," there is no indication that this was his sole rationale. He reasonably did not want to open the door for the senior prosecutor to make an argument about anything that could harm his client, including, but not limited to, first-degree murder. Although "[t]he right to effective assistance [of counsel] extends to closing

arguments," counsel is entitled to "wide latitude in deciding how best to represent a client." Yarborough v. Gentry, 540 U.S. 1, 5–6 (2003) (per curiam). And, as the Supreme Court has recognized, "it might sometimes make sense to forgo closing argument altogether." Id. at 6. Given the circumstances, I cannot conclude that Edwards' decision to waive closing argument was a decision that "no competent lawyer would have chosen." Dunn, 141 S. Ct. at 2410.

Additionally, Edwards reasonably agreed to the proposal by John Ohlson, defendant Robert Schnueringer's attorney, that all of the codefendants waive closing argument. Not only was Edwards worried about the government's giving a persuasive rebuttal, he also had an interest in preventing the codefendants from presenting a closing argument that could hurt his client. The codefendants had argued that Petitioner started the fight with the victim and used brass knuckles to commit the most brutal part of the attack.[1] Edwards already felt "sandbagged" by Ohlson, who had attacked Petitioner's credibility by noting that Petitioner was associated with a neo-Nazi movement and had bragged about killing the victim. Given the demonstrated hostility of the codefendants, Edwards made a legitimate strategic choice to shield the jury from any reminder of the codefendants' damaging accusations right before the jury began deliberations. Contrary to the majority opinion's characterization of Edwards' actions, he did not waive closing argument "only because Ohlson suggested that they do so." Maj. Op. at 15.

---

[1] Schnueringer presented three witnesses at trial—Aaron Simpson, Zachary Fallen, and Zachary Smith—and each one testified that Petitioner told them (a) that he had used brass knuckles in the fight and (b) that the last person Petitioner had hit died.

The majority opinion fairly notes that Edwards' defense might have been aided by a closing argument that explicitly addressed issues like proximate cause. Maj. Op. at 15. But that argument rests on the "distorting effects of hindsight." Strickland, 466 U.S. at 689. We "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Id. at 690. In my view, the decision to waive closing argument was "precisely the sort of calculated risk that lies at the heart of an advocate's discretion." Gentry, 540 U.S. at 9.

Petitioner also failed to demonstrate that Edwards' waiver prejudiced him. The majority opinion asserts that, had Edwards taken the opportunity to present a closing, Petitioner's culpability could have been distinguished from his codefendants'. Maj. Op. at 15–16. But under Strickland, "[t]he likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 112 (2011). Even in the absence of a closing argument, Edwards took advantage of his opening statement, his questioning of witnesses, and his client's own testimony to present a robust defense. See Hovey v. Ayers, 458 F.3d 892, 906–07 (9th Cir. 2006) ("Where counsel's failure to oppose the prosecution occurs only in isolated points during the trial, we will not presume prejudice."). Moreover, the court instructed the jury to base its verdict on the evidence presented at trial, not on the statements of counsel.

Even if Edwards' decision to waive closing argument was questionable, we also must apply the deference mandated by AEDPA. Knowles, 556 U.S. at 121, 123. In particular, federal habeas relief is not available whenever we disagree with a state court's decision. We may grant the writ only if we conclude that the state court's decision was

"contrary to, or involved an unreasonable application of, clearly established [f]ederal law."  28 U.S.C. § 2254(d)(1).

Here, not only was the decision to waive closing argument objectively reasonable in the circumstances, it also is essentially the same strategy that the Supreme Court approved in Bell v. Cone, 535 U.S. 685 (2002).  As in Bell, Edwards faced two options:  he could give a closing argument and thus give the lead prosecutor, who was very persuasive, the chance to depict his client as a heartless killer just before the jurors began deliberations, or he could prevent the lead prosecutor from doing so by waiving his own closing argument.  See Bell, 535 U.S. at 701–02.  The Supreme Court held that "[n]either option . . .  so clearly outweigh[ed] the other that it was objectively unreasonable for the [state court] to deem counsel's choice to waive argument a tactical decision about which competent lawyers might disagree."  Id. at 702.  The same is true here.  Even if Bell is distinguishable, the factual differences are not significant enough to render unreasonable the Nevada state court's decision under Strickland.[2]  Thus, Petitioner has not shown that the state court's interpretation is "so obviously wrong that its error lies 'beyond any possibility for

---

[2] Although the majority opinion distinguishes Bell by arguing that the decisions of Cone's trial counsel reflected tactical decision-making far superior to that of Kelsey's counsel, Maj. Op. at 15, the facts of Bell reveal the opposite.  Bell involved a death penalty case in which the need for a competent closing argument was significantly more important.  See Bell, 535 U.S. at 714 (Stevens, J., dissenting) ("Perhaps that burden was insurmountable, but the jury must have viewed the absence of any argument in response to the State's case for death as [trial counsel's] concession that no case for life could be made.  A closing argument provided the only chance to avoid the inevitable outcome of the 'primrose path'—a death sentence." (emphasis added)).

fairminded disagreement.'"  Shinn v. Kayer, 141 S. Ct. 517, 523 (2020) (per curiam) (quoting Richter, 562 U.S. at 103).

### B.        Failure to Consult a Forensic Pathology Expert

The majority opinion also argues that Edwards was ineffective for failing to consult a forensic pathologist.[3]  Maj. Op. at 20.  Under Strickland, "attorneys have considerable latitude to make strategic decisions about what investigations to conduct once they have gathered sufficient evidence upon which to base their tactical choices." Jennings v. Woodford, 290 F.3d 1006, 1014 (9th Cir. 2002) (emphasis omitted).  Edwards already possessed reports from two well-respected experts, and both concluded that Petitioner's actions could have contributed directly to the victim's death.[4]  The majority opinion chides Edwards for failing to call a third expert, Dr. Amy Llewellyn.  Maj. Op. at 23–24.  But Dr. Llewellyn never expressly disavowed the prosecution's theory that Petitioner's attack contributed to the victim's death.  Though Dr. Llewellyn's testimony was less damning than that of the prosecution's experts, she admitted that, if Petitioner knocked the victim down and kneed him in the head, as the evidence showed he did, those acts could cause "a concussion or an injury to the brain" and "could cause the brain to bleed."  In other words, even Dr.

---

[3] The Nevada Court of Appeals concluded that Petitioner failed to demonstrate prejudice, without addressing the issue of deficient performance.  Accordingly, we review de novo whether Petitioner demonstrated deficient performance.  Tamplin v. Muniz, 894 F.3d 1076, 1083 (9th Cir. 2018).

[4] At trial, Dr. Clark testified that she observed five separate areas of bleeding on the victim's brain.  She concluded that the victim died from the cumulative effect of the blows to his head.  Dr. Omalu agreed with Dr. Clark's findings.

Llewellyn recognized that Petitioner's actions could have been a <u>substantial factor</u> in the victim's death. As will be explained below, Petitioner is guilty of the crime of conviction even if his acts were only a "substantial factor" in the killing. And if Dr. Llewellyn's opinion was indicative of the testimony of other independent experts,[5] Edwards would have invested significant time and energy pursuing an issue that ultimately would have proved fruitless.

In its analysis of the deficient-performance prong, the majority opinion relies on <u>Duncan v. Ornoski</u>, 528 F.3d 1222 (9th Cir. 2008), a case in which defense counsel's failure to consult an expert resulted in key exculpatory evidence going unexplored. <u>See</u> <u>id.</u> at 1236 (holding that defense counsel's failure to consult an expert meant that he "had no basis upon which to devise his defense strategy"). Unlike in <u>Duncan</u>, Edwards' failure to consult an expert did not deprive him of a viable defense strategy. Edwards knew that causation would be a major issue in the trial, and he skillfully cross-examined witnesses in a way that suggested that the fatal blows did not come from his client.

Consultation with an expert might have facilitated a more elegant presentation of the defense's theory. But Edwards testified that, despite declining to consult with an expert, he "didn't feel like [he] was undermanned" when

---

[5] The majority opinion refers to a hearsay statement attributed to Dr. Haddix, who never testified, was never cross-examined, and never authored an expert report. Maj. Op. at 23. But it is improper to rely on that hearsay statement for the truth of the matter asserted. At the deposition, Petitioner explicitly agreed that he was <u>not</u> offering that statement for the truth of the matter asserted. And the record contains no expert testimony suggesting that Petitioner's actions were <u>not</u> a substantial factor in the victim's death.

questioning the government's experts.  This court should not expand Strickland to stand for the proposition that a defense attorney always must consult with an expert when the government puts forth its own expert.  Cf. Richter, 562 U.S. at 111 ("Strickland does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense.").

The majority opinion also fails to explain precisely how consultation with any forensic expert would have resulted in a different outcome at trial.  The government charged Petitioner with open murder, which included second-degree murder.  Under Nevada law, Petitioner was guilty of second-degree murder if he killed the victim and acted with "reckless disregard of consequences and social duty," Guy v. State, 839 P.2d 578, 582–83 (Nev. 1992), or if he committed an unlawful act that "naturally tends" to take the life of a human being, Sheriff v. Morris, 659 P.2d 852, 858–59 (Nev. 1983).  The state court found that the medical examiner who conducted the forensic autopsy "testified that the first blow to [the victim's] head could have been the fatal blow."[6]  Kelsey v. State, 130 Nev. 1204, 2014 WL 819465, at *2 (Feb. 27, 2014).  And the evidence is undisputed that Petitioner delivered the first blows to the victim's head.  As the state court found, Petitioner "struck [the victim] twice in the head" even though the victim had his hands in the air at the time and that Petitioner then "kneed him in the head twice" as the victim fell to the ground.  Id. at *1.

Although the majority opinion downplays the significance of the harm inflicted by Petitioner, likening it to

---

[6] Petitioner did not challenge the state court's findings of fact, so those facts are conclusive.  28 U.S.C. 2254(e)(1).

a teenage squabble, the undisputed facts suggest that Petitioner's actions could have been just as damaging as the "savage, brutal beating" delivered by Schnueringer and Jefferson. Maj. Op. at. 5. As long as Petitioner's acts were a substantial factor in the victim's death, the mere fact that an expert could opine that he did not deliver the final fatal blow does not absolve him of criminal liability. See Etcheverry v. State, 821 P.2d 350, 351 (Nev. 1991) (per curiam) ("[A]n intervening cause must be a superseding cause, or the sole cause of the injury in order to completely excuse the prior act." (emphasis omitted)).

In sum, the state court reasonably concluded that Petitioner failed to meet the requirements of Strickland as to either the waiver of closing argument or the decision not to consult a forensic pathology expert. I would affirm the district court's denial of habeas relief and, therefore, dissent.